| | |
|---|---|
| Carlos Romero Barceló, Peter Muller, Hipólito Robles Rivera, Antonio Pino Marina y otros<br><br>Demandantes-peticionarios<br><br>vs.<br><br>Estado Libre Asociado de Puerto Rico, Hon. Aníbal Acevedo Vilá en su capacidad de Gobernador, Hon. Juan Carlos Méndez Torres, En su capacidad de Secretario de Hacienda<br><br>Demandados-recurridos | Certiorari<br><br>2006 TSPR 163<br><br>169 DPR \_\_\_\_ |

Número del Caso: CT-2006-9

Fecha: 10 de noviembre de 2006

Abogados de la Parte Peticionaria:

Lcdo. Charles A. Rodríguez Colón
Lcdo. Carlos Romero Barceló

Banco Gubernamental de Fomento para Puerto Rico:

Lcdo. Jorge E. Pérez Díaz
Lcda. Heidi L. Rodríguez Benítez
Lcda. Sara L. Vélez Santiago

Cámara de Representantes de Puerto Rico:

Lcdo. Richard W. Markus
Lcdo. Manuel D. Herrero
Lcdo. Carlos E. Pérez Acosta

Oficina del Procurador General:

Lcda. Sarah Y. Rosado Morales
Prouradora General Auxiliar

Senado de Puerto Rico

Lcdo. Ángel J. Vargas Carcaña
Lcdo. Kevin Miguel Rivera-Medina

Materia: Certificación

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

Carlos Romero Barceló, Peter
Muller, Hipólito Robles Rivera,
Antonio Pino Marina y otros

     Demandantes-peticionarios

        vs.

                    CT-2006-9     CERTIFICACIÓN

Estado Libre Asociado de Puerto
Rico, Hon. Aníbal Acevedo Vilá
en su capacidad de Gobernador,
Hon. Juan Carlos Méndez Torres,
en su capacidad de Secretario
de Hacienda

     Demandados-recurridos

OPINIÓN DEL TRIBUNAL EMITIDA POR EL JUEZ ASOCIADO SEÑOR REBOLLO LÓPEZ

San Juan, Puerto Rico, a 10 de noviembre de 2006

El 15 de noviembre de 2005, la delegación de la mayoría de la Cámara de Representantes de Puerto Rico radicó el Proyecto de la Cámara 2193 --en adelante, el "Proyecto"-- con el objetivo de establecer la Ley de la Justicia Contributiva de 2006. Mediante el mismo, como paso inicial hacia una reforma contributiva de gran justicia social, se pretendía establecer un impuesto sobre ventas, uso y almacenamiento a una tasa contributiva de 7%. A esos efectos, el referido Proyecto disponía:

> **Sección 7003 –** Limitación para Fijar Impuestos
>
> Ningún municipio o división política o administrativa del Gobierno del Estado Libre Asociado de Puerto Rico, podrá imponer o recaudar ningún arbitrio o

impuesto de venta local sobre cualquier artículo de propiedad mueble tangible sujeto al pago de impuestos bajo las disposiciones de este Subtítulo. Se exceptúa de esta disposición leal [sic] impuesto sobre el volumen de negocio autorizado por la Ley Núm. 113 de 10 de julio de 1974, según enmendada, conocida como "Ley de Patentes Municipales", cuya imposición por los municipios queda expresamente autorizada, debiendo incluirse en el volumen de negocios las operaciones mercantiles sobre los artículos gravados por este Subtítulo, sin que dicho volumen de negocios sea incrementado por el importe del impuesto general a las ventas, uso y consumo. No obstante, cuando la aplicación de la Ley de Patentes Municipales, conjuntamente con la aplicación de este Subtítulo produzca una situación contributiva insostenible por infringir alguna prohibición constitucional, si dicha imposición fuere sostenible mediante la imposición y cobro de uno solo de los impuestos, prevalecerá el impuesto fijado en este subtítulo.

CAPITULO II- IMPUESTOS SOBRE VENTAS AL DETAL

**Sección 7005**- Impuestos sobre ventas, uso y almacenamiento

(a) Se impondrá, cobrará, y pagará, a los tipos prescritos [en] esta sección un impuesto sobre toda transacción de venta al detal, incluyendo las órdenes por correo, o transacción unitaria de propiedad mueble tangible o servicios tributables, admisiones, su almacenaje, uso o consumo en Puerto Rico y dicho impuesto se pagará una sola vez, en el tiempo y en la forma especificadas en el Capítulo V de este Subtítulo.

(1) Cada unidad o artículo de propiedad mueble tangible que se venda al detal en Puerto Rico <u>tributará a una tasa de 7% del precio de venta</u>.

(2) Cada artículo de propiedad mueble tangible, cuando el mismo no se venda pero se use, consuma o almacene para su uso o consumo en Puerto Rico <u>tributará a una tasa de 7% del precio de compra</u>.

(3) Cada persona, natural o jurídica, que efectúe pagos a otra persona por concepto de servicios tributables prestados en o fuera de Puerto Rico, según éstos se definen en este

Subtítulo, <u>tributará a una tasa de 7% del precio de venta</u>. (Énfasis suplido).

Una vez presentado el Proyecto, éste se refirió a la Comisión de Hacienda y Asuntos Financieros de la Cámara de Representantes —en adelante, la "Comisión"— para su análisis e informe. Luego de celebradas las vistas públicas correspondientes[1], el 20 de junio de 2006 la Comisión presentó su informe. En éste, <u>recomendó la aprobación sin enmiendas de un Sustitutivo del Proyecto de la Cámara 2193</u> —en adelante, el "Proyecto Sustitutivo". Dicho Proyecto Sustitutivo —hoy convertido en ley[2]—, en lo pertinente <u>dispone</u> que:

SUBTITULO BB – IMPUESTO SOBRE VENTAS Y USO

CAPITULO 2 – IMPOSICIÓN, COBRO Y PERSONA RESPONSABLE

**Sección 2401** – Impuesto sobre Ventas

(a) Se impondrá, cobrará, y pagará, a los tipos establecidos en esta sección, un impuesto sobre toda transacción de venta de una partida tributable. La aplicación del impuesto estará sujeta a las exenciones concedidas en el Capítulo 3 de este Subtítulo.

(b) <u>La tasa contributiva será de un cinco punto cinco (5.5%) del precio de venta de la partida tributable y de transacciones combinadas</u>. (Énfasis nuestro).

---

[1] Según surge de la demanda presentada en el caso de epígrafe, la Comisión celebró sobre 47 vistas públicas y ejecutivas entre el 3 de diciembre de 2005 y el 24 de mayo de 2006.

[2] Ley Núm. 117 del 4 de julio de 2006.

**Sección 2402** – Impuesto sobre Uso

(a) Se impondrá, cobrará, y pagará, a los tipos establecidos en esta sección, un impuesto sobre uso, almacenaje o consumo de una partida tributable en Puerto Rico.

(b) La tasa contributiva será de un cinco punto cinco (5.5%) del precio de compra de la partida tributable. (Énfasis nuestro).

**Sección 2410** – Limitación para fijar impuestos

Excepto según se dispone en la Sección 6189, ningún municipio, autónomo o no, del Estado Libre Asociado de Puerto Rico, podrá imponer o recaudar arbitrio o impuesto alguno sobre artículos, servicios, partidas tributables o transacciones que estén sujetos o eximidos del impuesto sobre ventas y uso establecido en este Subtítulo, según establecido en la Sección 6188 del Subtítulo F.

SUBCAPÍTULO B – REGULACIÓN DE LAS DISPOSICIONES RELACIONADAS A REPRESENTANTES CONTRIBUTIVOS ANTE EL DEPARTAMENTO

**Sección 6188** – Limitación para Fijar Impuestos

Excepto según se dispone a continuación o en la Sección 6189, ningún municipio autónomo o no, del Estado Libre Asociado de Puerto Rico, podrá imponer o recaudar ninguna contribución o impuesto establecido en este Código. Se exceptúan de esta disposición los arbitrios de construcción y el impuesto sobre el volumen de negocio autorizados por la Ley Núm. 81 de 30 de agosto de 1991, según enmendada, conocida como "Ley de Municipios Autónomos" y la Ley Núm. 113 de 10 de julio de 1974, según enmendada, conocida como "Ley de Patentes Municipales", respectivamente, cuya imposición por los municipios queda expresamente autorizada. No obstante, cuando la aplicación de la Ley de Municipios Autónomos y la Ley de Patentes Municipales, conjuntamente con la aplicación de este Código produzca una situación contributiva insostenible por infringir alguna prohibición constitucional, si dicha situación fuere sostenible mediante la imposición y cobro de una sola de las contribuciones o impuestos, prevalecerá la contribución o el impuesto fijado en este Código. (Énfasis nuestro).

**Sección 6189** – Imposición Municipal de Impuesto de Ventas y Uso al Detal

A. Se autoriza a los Municipios a imponer un impuesto sobre ventas y uso al detal de conformidad con la autorización establecida en la Sección 2410. <u>Dicha contribución será por una tasa contributiva de un uno punto cinco (1.5) por ciento, a ser impuesta de conformidad con la misma base, exenciones y limitaciones contenidas en el Subtitulo BB del Código</u>, excepto que tributaran [sic] sobre todos los alimentos, a ser establecida e impuesta de manera uniforme por todos los municipios de Puerto Rico mediante Ordenanza Municipal al efecto. Así mismo, se tomaran [sic] también en cuenta las áreas de campo acopado [sic] Federal como otra excepción autorizada.

La tasa del impuesto municipal de uno punto cinco por ciento (1.5) se distribuirá en forma proporcional de la siguiente manera:
   i.   una tasa de uno punto dos por ciento (1.2) para el municipio
   ii.  una tasa de punto uno por ciento (.1) para el Fondo de Mejoras Municipales
   iii. una tasa de punto dos por ciento (.2) como una aportación Municipal al Fondo General para alivios contributivos a individuos … . (Énfasis nuestro).

Así las cosas, el 21 de junio de 2006 el Proyecto Sustitutivo fue sometido a la consideración del pleno de la Cámara de Representantes de Puerto Rico --en adelante, la "Cámara de Representantes"-- y éste fue <u>aprobado</u> con 31 votos a favor y 18 en contra.[3] En esa misma fecha, la Cámara de Representantes envió al Senado de Puerto Rico --en adelante, el "Senado"-- el texto de aprobación final

---

[3] Previo a su aprobación, algunas porciones del mismo fueron enmendadas en el Hemiciclo. <u>Estas enmiendas en nada afectaron las disposiciones aquí en cuestión y previamente transcritas</u>.

del Proyecto Sustitutivo y, el 25 de junio de 2006, éste fue aprobado por el Senado --sin enmiendas-- con 23 votos a favor y 2 en contra.[4]

Concluida la votación previamente señalada, surgieron diferencias, de conocimiento público, respecto a la tasa contributiva que, en efecto, se impuso mediante la referida pieza legislativa. Mientras que el Gobernador de Puerto Rico, Hon. Aníbal Acevedo Vilá, y el Presidente del Senado, Hon. Kenneth McClintock, entre otros, entendieron que el Proyecto Sustitutivo impone una tasa contributiva total de un 7%, una mayoría de los miembros de la Cámara de Representantes expresaron que, mediante el Proyecto Sustitutivo aprobado, se estableció un impuesto a la venta con una tasa contributiva única y total de 5.5%, distribuido en un 4% correspondiente al impuesto estatal y un 1.5% correspondiente al impuesto municipal.[5]

El 4 de julio de 2006 el Gobernador firmó el Proyecto Sustitutivo, según éste fue aprobado por la Cámara de

---

[4] Dicha aprobación se emitió sin el previo informe de la Comisión de Hacienda del Senado y sin la celebración de un debate entre los miembros de dicho cuerpo.

[5] Véase R. de la C. 5269 del 27 de junio de 2006 y R. Conc. De la C. 81, las cuales se emitieron con el objetivo de "reafirmar el propósito y la realidad legislativa del Sustitutivo del Proyecto de la Cámara 2193, mejor conocido como 'Ley de Justicia Contributiva de 2006', para evitar posibles mal interpretaciones al mismo; ratificar el establecimiento de un impuesto a la venta con una tasa única de cinco punto cinco por ciento (5.5%), distribuido en cuatro por ciento (4%) correspondiente al impuesto estatal y otro uno punto cinco por ciento (1.5%) correspondiente al impuesto municipal".

Representantes y el Senado el 21 y 25 de junio de 2006, respectivamente.[6] A partir de ese momento, la Rama Ejecutiva ha tomado todas las medidas necesarias para la imposición del impuesto estatal sobre la venta y el uso a una tasa contributiva de 5.5%, a la cual, <u>a partir del 15 de noviembre de 2006</u>, se le sumará una tasa contributiva de 1.5% correspondiente al impuesto municipal.[7]

Así pues, ante la <u>inminente imposición</u> de un impuesto a la venta y al uso a una tasa contributiva total máxima de 7%, Carlos Romero Barceló y Peter Muller Maldonado, en calidad de contribuyentes afectados, y los demás demandantes, en calidad de contribuyentes y pensionados afectados, presentaron ante el Tribunal de Primera Instancia, Sala de San Juan, una demanda sobre sentencia declaratoria en contra del Estado Libre Asociado de Puerto

---

[6] <u>Previo</u> a la firma del Gobernador, la Cámara de Representantes aprobó un documento titulado "Sustitutivo al Proyecto Cameral 2193 de Reforma Contributiva" con el objetivo de reconsiderar y enmendar ciertas disposiciones del Proyecto Sustitutivo dirigidas a establecer el monto de la tasa contributiva. Una notificación al respecto fue remitida al Senado, pero este cuerpo rehusó considerarla y se negó a devolver el proyecto a la Cámara de Representantes para su reconsideración. Ante las diferencias ocurridas entre ambos cuerpos legislativos, incluyendo la negativa de remitirle al Gobernador el proyecto aprobado para su correspondiente consideración y firma, el Gobernador y el Hon. José Luis Dalmau Santiago acudieron ante este Tribunal mediante recurso de *mandamus.* <u>Expedimos el auto de *mandamus* y ordenamos la remisión del Proyecto Sustitutivo al Gobernador, según éste fue aprobado por la Cámara de Representantes y el Senado, el 21 y 25 de junio de 2006, respectivamente. Acevedo Vilá v. Aponte Hernández</u>, res. el 3 de julio de 2006, 2006 T.S.P.R. 115.

[7] Véase Reglamento 7230 del 13 de octubre de 2006.

Rico, el Hon. Aníbal Acevedo Vila, Gobernador de Puerto Rico, y el Hon. Juan Carlos Méndez Torres, en su capacidad de Secretario de Hacienda. En ésta, impugnaron la interpretación, alegadamente errónea, que la Rama Ejecutiva pretende poner en efecto al imponer una tasa contributiva de 5.5% para el Estado y un 1.5% para los municipios, para un impuesto total máximo sobre ventas y uso de un 7%.

Solicitaron que se le ordenara a los demandados interpretar y cumplir con la Ley de la Justicia Contributiva de 2006, en atención a la intención, propósito e historial legislativo de la misma, a saber, el establecimiento de un impuesto sobre ventas y uso con una tasa única y total de un 5.5%, de cuyos recaudos el 4% corresponde al estado y el 1.5% corresponde a los municipios.[8] A su vez, adujeron que la interpretación, alegadamente errónea y tergiversada de la mencionada Ley por parte del Presidente del Senado y la Rama Ejecutiva, incide sobre la Sección 17 del Artículo III de nuestra Constitución, la cual dispone, en síntesis, que todo proyecto de ley para obtener rentas se originará en la Cámara de Representantes y que el Senado podrá proponer enmiendas o convenir en ellas. Entienden éstos que es

---

[8] Solicitaron además la expedición, en su momento, de cualquier remedio provisional o permanente, con el objetivo de ordenarle a los demandados imponer un impuesto sobre ventas y uso a una tasa contributiva total y única de 5.5%.

contrario al propósito constitucional allí consagrado que el Senado y la Rama Ejecutiva puedan sustituir la intención legislativa de la Cámara de Representantes en un proyecto de esta naturaleza.

Una vez presentada la demanda antes esbozada y expedidos y diligenciados los emplazamientos correspondientes, el 31 de octubre de 2006 los demandantes acudieron ante este Tribunal --mediante recurso de Certificación-- aduciendo que la intervención de este Foro es necesaria dado el interés publico que reviste la controversia involucrada.

Le concedimos a las partes hasta el martes, 7 de noviembre de 2006, para que se expresaran.[9] En vista de que la controversia planteada en el presente recurso --sobre cuál es la tasa contributiva que en realidad impone la Ley Número 117 del 4 de julio de 2006-- es una de alto interés público que debe ser resuelta en forma definitiva y sin dilación alguna, ya que su fecha de vigencia es inminente; que dicha controversia no sólo afecta, de manera directa, el presupuesto del consumidor puertorriqueño sino que puede afectar el crédito del Estado Libre Asociado de Puerto Rico y, por ende, el futuro y bienestar de todos los puertorriqueños, avalamos la solicitud de

---

[9] Posteriormente, le concedimos el mismo término a la Cámara y al Senado de Puerto Rico para que expresaran sus respectivas posiciones.

certificación que ante este Tribunal radicaran los demandantes-peticionarios.

Contando con las comparecencias de las partes y las posiciones de la Cámara de Representantes y el Senado respecto al recurso solicitado, nos encontramos en posición de resolverlo y procedemos a así hacerlo.

II

Aun cuando la parte demandada recurrida acepta, en su comparecencia, la legitimación activa de los demandantes-peticionarios y la justiciabilidad de la controversia ante nuestra consideración, es norma reiterada que este Tribunal, como celoso guardián de su jurisdicción, viene obligado a considerar, *motu propio* o a petición de parte, todo asunto relativo a su jurisdicción, pues no posee discreción de asumirla allí donde no la hay. Morán Ríos v. Martí Bardisona, res. el 5 de agosto de 2005, 2005 T.S.P.R. 110; A.A.A. v. Unión, res. el 11 de diciembre de 2002, 2002 T.S.P.R. 149. En consecuencia, y previo a cualquier ulterior análisis, precisa analizar y determinar si, en efecto, las partes y la controversia hoy ante nuestra consideración cumplen con ciertos requisitos de justiciabilidad, criterios indispensables de nuestra jurisdicción.

Sabido es que la jurisdicción de nuestros tribunales se limita a aquellas instancias en que pueda precisarse la existencia de un caso o controversia, pues "los tribunales

existen únicamente para resolver controversias genuinas surgidas entre partes opuestas que tienen interés real en obtener un remedio que haya de afectar sus relaciones jurídicas". E.L.A. v. Aguayo, 80 D.P.R. 552, 558-559(1958). En aras de proteger dicho principio, se han desarrollado ciertos criterios de justiciabilidad que demarcan la facultad de los tribunales para entender en un asunto traído ante sí. Entre éstos, la legitimación activa de la parte que promueve el pleito y la madurez de la controversia planteada.

A

Una parte posee legitimación activa si cumple con los siguientes requisitos: 1) que ha sufrido un daño claro y palpable; 2) que el daño es real, inmediato y preciso y no uno abstracto o hipotético; 3) que existe conexión entre el daño sufrido y la causa de acción ejercitada; y 4) que la causa de acción surge bajo el palio de la Constitución o de una ley. Colegio de Peritos Electricistas v. A.E.E., 150 D.P.R. 327 (2000); Asociación de Maestros v. Arsenio Torres, 137 D.P.R. 528 (1994); Hernández Torres v. Hernández Colón, 129 D.P.R. 824 (1992); Hernández Agosto v. Romero Barceló, 112 D.P.R. 407 (1982); Fundación Arqueológica v. Depto. de la Vivienda, 109 D.P.R. 387 (1980).

Resulta indispensable que el daño alegado sea uno concreto y particular, pues un daño generalizado que el

demandante comparta con el resto de la ciudadanía impide la configuración de su legitimación activa para promover el pleito. Fundación Arqueológica v. Depto. de la Vivienda, *ante*. Véase, además, Warth v. Seldin, 422 U.S. 490 (1975). Acorde con este requisito, los tribunales carecen de jurisdicción para entender en aquellas reclamaciones en que el promovente, por su mera condición de contribuyente, impugna un gasto del Estado, pues el daño que éste pueda sufrir en calidad de contribuyente es generalizado y compartido con el resto de la ciudadanía. Véase, Frothingham v. Mellon, 262 U.S. 447 (1923).

En Puerto Rico, dicha prohibición se encuentra regulada mediante legislación específica. Al respecto, la Sección 3075 de la Ley de Pleitos contra el Estado, 32 L.P.R.A. § 3075, dispone:

**3075. Acción del contribuyente, prohibida- Jurisdicción de los tribunales**

Ningún tribunal de Puerto Rico tendrá jurisdicción para conocer, o continuar conociendo si se hubiera ya iniciado, bien en primera instancia o en grado de apelación, de ninguna acción o procedimiento en que se impugne la validez o constitucionalidad de cualquier ley o resolución de la Asamblea Legislativa de Puerto Rico o de cualquier actuación de un funcionario público autorizada por ley de la Asamblea Legislativa de Puerto Rico, cuando el demandante no alegue otro interés en la acción o procedimiento, ni otra capacidad para demandar, que la de ser contribuyente o representar a los contribuyentes como clase y que, como tal, sufre o pueda sufrir daños por virtud de dicha ley, resolución o actuación.

No obstante, es de notar que la prohibición del pleito del contribuyente no es absoluta. En el año 1968, el Tribunal Supremo de los Estados Unidos estableció una excepción a la norma y le reconoció legitimación activa al contribuyente que impugne una asignación presupuestaria, por ésta operar en violación a la cláusula de establecimiento de la Primera Enmienda de la Constitución Federal. Flast v. Cohen, 392 U.S. 83 (1968). Dicha excepción fue adoptada en nuestra jurisdicción en Asociación de Maestros v. Arsenio Torres, *ante*, resolviéndose que la prohibición regulada en la Sección 3075 de la Ley de Pleitos contra el Estado adviene inaplicable ante reclamaciones en que un contribuyente impugna gastos públicos, por éstos operar en violación a las cláusulas constitucionales locales contra el establecimiento de una religión y contra el uso de fondos públicos para el sostenimiento de escuelas privadas.

De igual forma, el Tribunal Supremo de los Estados Unidos ha reconocido que un contribuyente tiene legitimación activa para impugnar una ley contributiva que determina su propia responsabilidad como contribuyente. Véase: Bacchus Imports v. Dias, 468 U.S. 263. A esos efectos, Laurence H. Tribe expone:

> The doctrines limiting taxpayer standing furnish another example of the policy against the assertion of generalized grievances. A taxpayer of course has standing to challenge the validity or application of a taxing statute in determining his or her own tax obligation. Less obviously, in his or her capacity as a taxpayer,

to challenge spending programs of the taxing government, on the theory –or, more candidly, the fiction– that a successful suit against such a program can result in some decrease in the litigant's taxes. L. H. Tribe, <u>American Constitutional Law</u>, Third Edition–Volume One, Foundation Press, New York, 2000, pág. 421. (Énfasis nuestro).

A su vez, el Profesor Raúl Serrano Geyls nos ilustra:

La acción del contribuyente ––una forma de la "acción pública" ––tiene dos vertientes. Primero, aquélla en la cual el ciudadano cuestiona su obligación de pagar o el monto de su aportación contributiva en un pleito para obtener reembolso fundado en alegadas infracciones de ley o de constitución. Segundo, aquélla en la cual la persona impugna un acto del gobierno como inconstitucional y alega, como razón para probar su interés de litigante, que él contribuye, mediante el pago de impuestos, al sostenimiento económico del acto alegadamente inconstitucional. En ese caso, el ciudadano litiga como uno de miles de contribuyentes que aportan una suma al Tesoro Público, del cual sale el dinero que se utiliza para ese gasto calificado como inconstitucional. En esa acción el litigante no sufre daño directo personal, ya que gane o pierda no se le reducirá ni se le devolverá su contribución. ... R.S. Geyls, <u>Derecho Constitucional de Estados Unidos y Puerto Rico</u>, Volumen 1, Colegio de Abogados de Puerto Rico, Instituto de Educación Práctica, Inc., 1986, pág. 132.

En el presente caso, todos los demandantes impugnan la pieza legislativa en cuestión en calidad de contribuyentes afectados.[10] <u>La pieza legislativa que</u>

_____

[10] Algunos de los demandantes impugnan la pieza legislativa <u>en controversia en calidad de pensionados afectados</u>. Aducen que la tasa contributiva que la Rama Ejecutiva pretende imponer afecta sus respectivas finanzas personales y el poder adquisitivo de sus pensiones. A base de la doctrina previamente esbozada, entendemos que estos no poseen legitimación activa por la mera condición de

(Continúa . . .)

impugnan, sin duda alguna, es una que determina la responsabilidad de éstos como contribuyentes. Ello implica que bajo la doctrina establecida en Bacchus Imports v. Dias, *ante*, y avalada por los tratadistas previamente citados, los demandantes en cuestión poseen legitimación activa para impugnar la Ley de la Justicia Contributiva de 2006, según ésta ha sido interpretada por la Rama Ejecutiva.

En el pasado, hemos sido flexibles al interpretar los requisitos sobre legitimación activa. Asociación de Maestros v. Srio. del Depto. de Educación, 156 D.P.R. 754 (2002); Colegio de Ópticos v. Vani Visual, 124 D.P.R. 559 (1989). Hoy damos ejemplo de ello y avalamos en nuestra jurisdicción la legitimación activa de un contribuyente para impugnar una ley contributiva que determina su responsabilidad en tal carácter. A diferencia de otros casos en que se les ha negado legitimación activa a los contribuyentes, aquí los demandantes no impugnan un gasto del Estado o una asignación presupuestaria. Todo lo contrario. Los aquí demandantes impugnan una pieza legislativa impositiva de una contribución y la interpretación que finalmente se le brinde a ésta incide de modo definitivo sobre la responsabilidad contributiva

---

pensionados afectados. El daño alegado es uno generalizado compartido con la ciudadanía en general, pues igual que a los pensionados, los asalariados verán afectadas sus respectivas finanzas y el poder adquisitivo de sus salarios.

de éstos. En ello, precisamente, recae el daño real y concreto requerido.

De ser ciertas las alegaciones esbozadas en la demanda, y no reconocer la jurisdicción de este Tribunal por falta de legitimación activa, éstos vendrán obligados a asumir el pago de un impuesto sobre la venta y el uso a una tasa contributiva alegadamente distinta a la realmente impuesta por el legislador. Es para estas circunstancias particulares que se ha reconocido la facultad de los tribunales de interpretar los estatutos aprobados por la Asamblea Legislativa.

Negarles legitimación activa a los demandantes en calidad de contribuyentes, ante las circunstancias particulares del presente caso, sería abdicar nuestra función de máximo intérprete de los estatutos sin justificación de envergadura que nos obligue a decretar nuestra falta de jurisdicción. Resolver lo contrario implicaría, incluso, avalar la inimpugnabilidad de estatutos de esta naturaleza, pues aquellos a quienes más afectan, entiéndase los contribuyentes, no tendrían legitimación para impugnarlas.[11]

---

[11] Resulta pertinente señalar que ni la Ley 117 ni el Reglamento proveen un remedio en ley para la impugnación de la contribución impuesta o el reembolso del pago hecho en exceso a la tasa contributiva establecida en el estatuto.

Confirmada la legitimación activa de los demandantes-peticionarios, pasamos a analizar y determinar la madurez de la presente controversia.

B

Sabido es que la presentación prematura de una acción también incide sobre la jurisdicción de los tribunales. La madurez se enfoca en la proximidad temporal o inminencia del daño alegado y debe examinarse mediante un análisis dual: si la controversia sustantiva es una apropiada para resolución judicial y si el daño es suficiente para requerir adjudicación. "El factor determinante es que la controversia esté definida concretamente de manera que el tribunal pueda evaluarla en sus méritos". Marie Rexach v. Ramírez Vélez, res. el 15 de junio de 2004, 2004 T.S.P.R. 97. "Todo lo que se necesita para asegurar que un caso está maduro es que el evento contemplado ... con toda probabilidad va a ocurrir". Comisión v. Giménez Muñoz, 109 D.P.R. 715 (1980).

El criterio de "madurez" no implica que una parte deba esperar a que un estatuto aprobado entre en vigencia para impugnarlo. A esos efectos, nuestro ordenamiento ostenta, como mecanismo remedial, la sentencia declaratoria, Regla 59 de las de Procedimiento Civil, 32 L.P.R.A. Ap. III. "La sentencia declaratoria es un mecanismo remedial y profiláctico que permite anticipar la dilucidación de los méritos de cualquier reclamación ante

los tribunales, siempre y cuando exista un peligro potencial contra el promovente". Sánchez v. Sec. De Justicia, 157 D.P.R. 360, 383-384 (2002).

La persona que presenta una solicitud de sentencia declaratoria se encuentra a su vez sujeto al cumplimiento de los criterios de legitimación activa, por lo cual, deberá establecer la existencia o inminencia de un daño claro y real. Sánchez v. Sec. De Justicia, *ante*. La aprobación del estatuto y su eventual vigencia debe ser definitiva, de lo contrario la causa de acción presentada para impugnarlo no estará madura, ello por no presentar una controversia real de naturaleza justiciable que requiera un pronunciamiento judicial. Véase, Asociación de Guardias Penales v. Sec. De Justicia, 87 D.P.R. 711 (1963). Impugnada oportunamente la interpretación de un estatuto mediante un recurso de sentencia declaratoria, y establecida la legitimación activa del promovente, la función del tribunal se remite al alcance e interpretación del mismo. P.P.D. v. Gobernador, 111 D.P.R. 8 (1981).

Una vez analizados los criterios antes esbozados, somos de la opinión que la presente controversia se encuentra madura para la correspondiente adjudicación judicial mediante el mecanismo de sentencia declaratoria. Es de conocimiento público que la Rama Ejecutiva ha tomado las medidas necesarias para la imposición de un impuesto estatal a una tasa contributiva de un 5.5%, la cual a partir del 15 de noviembre de 2006 se unirá a una tasa

contributiva de 1.5% correspondiente al impuesto municipal. La reglamentación necesaria por parte del Departamento de Hacienda ya ha sido aprobada. Sólo resta la llegada de la fecha de vigencia de la Ley de la Justicia Contributiva de 2006, a saber, el 15 de noviembre de 2006, para que ésta entre en vigor, según ha sido interpretada por la Rama Ejecutiva. Tanto la aprobación como la vigencia de la mencionada pieza legislativa es definitiva y su inminente aplicación reviste de concreción y de madurez a la reclamación presentada por los demandantes-peticionarios. Ello, unido a la legitimación activa previamente reconocida, nos permite dedicarnos, de lleno, a la interpretación de la Ley de la Justicia Contributiva de 2006.

III

El Artículo 14 del Código Civil, 31 L.P.R.A. § 14, dispone que "cuando la ley es clara y libre de toda ambigüedad, la letra de ella no debe ser menospreciada bajo el pretexto de cumplir su espíritu". En virtud de dicho mandato, al interpretar un estatuto, debemos, de entrada, remitirnos al texto de la ley, pues cuando el legislador se ha manifestado en lenguaje claro e inequívoco, el texto de la ley es la expresión por excelencia de toda intención legislativa. Véase: Ortiz López v. Mun. de San Juan, res. el 20 de abril de 2006, 2006 T.S.P.R. 64; Departamento de Hacienda v. Telefónica

<u>Larga Distancia de Puerto Rico</u>, res. el 17 de marzo de 2005, 2005 T.S.P.R. 32; <u>Irizarry v. Johnson & Johnson</u>, 150 D.P.R. 155 (2000); <u>Rodríguez Rosa v. Méndez & Co., Inc.</u>, 144 D.P.R. 734 (1999); <u>Rojas v. Méndez & Co.</u>, 115 D.P.R.50 (1984). Debido a ello, "... cuando una ley es clara y no es ambigua <u>no hay necesidad de mirar más allá de la letra en búsqueda de la intención legislativa</u>". Véase: <u>Departamento de Hacienda v. Telefónica Larga Distancia de Puerto Rico</u>, *ante*; <u>Rosario Toledo v. Distribuidora Kikuet, Inc.</u>, 151 D.P.R. 634 (2000). Debemos descubrir y darle efecto a la intención expresada mediante la letra de la ley.

En el cumplimiento de esta función, "resulta necesario que en la interpretación se [armonicen], hasta donde sea posible, <u>todas</u> las disposiciones de la ley con el propósito de lograr una interpretación integrada, lógica y razonable de la intención legislativa". <u>Matos Matos v. Junta Examinadora de Ingenieros y Agrimensores</u>, res. el 20 de septiembre de 2005, 2005 T.S.P.R. 138. Las disposiciones de una ley <u>no</u> deben ser interpretadas de manera aislada, <u>sino analizadas en conjunto tomando en consideración integralmente todo su contexto</u>. Véase: <u>Municipio de San Juan v. Banco Gubernamental de Fomento</u>, 140 D.P.R. 873 (1996).

A la luz de las reglas de hermenéutica legal antes esbozadas, pasamos a resolver la controversia en cuestión.

Los peticionarios aducen, en síntesis, que el texto de la Ley de la Justicia Contributiva de 2006 es por demás ambiguo, razón por la cual nos remiten al historial legislativo en busca de la "intención legislativa". A esos efectos, sostienen que mediante dicha Ley el legislador tuvo la intención de establecer un impuesto a la venta con una tasa única de 5.5%, distribuido en un 4% correspondiente al impuesto estatal y otro 1.5% correspondiente al impuesto municipal. No les asiste la razón. De un análisis ponderado de la pieza legislativa en cuestión, surge que la intención legislativa, según ésta se encuentra expresada en el texto claro de la Ley, es la imposición de un impuesto sobre las ventas y el uso a una tasa contributiva total máxima de 7%. Veamos.

La Ley de la Justicia Contributiva de 2006 regula el impuesto estatal y el impuesto municipal mediante artículos independientes. En la Sección 2410 establece un impuesto sobre las ventas y el uso a una tasa contributiva base de un 5.5%. Los fondos que se obtengan por el pago de dicho 5.5% pertenecen al Estado Libre Asociado, en virtud de lo dispuesto en la Sección 2405 (c) del estatuto.[12] En la Sección 6189 se autoriza a los municipios a imponer un impuesto a una tasa contributiva de 1.5%,

---

[12] Sección 2405 (c): "... Los impuestos que se fijan por este Subtítulo advendrán fondos del Estado Libre Asociado al momento de cobrarse".

cuyos recaudos, por mandato de la Sección 6189 A, corresponden a los municipios.[13]

A su vez, en la Sección 2406, la cual forma parte del Subtítulo BB sobre el impuesto a las ventas y al uso, se exime al comerciante, en casos en que sea impráctico, de exponer por separado el precio de la venta y el impuesto total cobrado en el recibo, factura o documento similar. A esos efectos y para poder eventualmente calcular la suma correspondiente al impuesto total cobrado, el Inciso (b) de dicha Sección dispone que: "... los impuestos a ser pagados sobre partidas tributables serán calculados restando del total de las ventas brutas para el periodo de reporte aplicable, el total de las ventas tributables para el mismo periodo. Las ventas tributables se determinarán dividiendo las ventas brutas entre un uno punto cero siete (1.07)". (Énfasis nuestro). Según se colige del texto, en la ecuación a realizarse debe utilizarse como variable 1.07, la cual en estricta matemática corresponde a una tasa contributiva total de 7%, situación o posición que, como veremos más adelante, es aceptada por los demandantes-peticionarios.

---

[13] Sección 6189 A: "La tasa del impuesto municipal de uno punto cinco por ciento (1.5) se distribuirá en forma proporcional de la siguiente manera: i. una tasa de uno punto dos por ciento (1.2) para el municipio; ii. una tasa de punto uno por ciento (.1) para el Fondo de Mejoras Municipales; iii. una tasa de punto dos por ciento (.2) como una aportación Municipal al Fondo General para alivios contributivos a individuos...". (Énfasis nuestro).

Armonizadas las disposiciones antes expuestas, resulta totalmente incompatible con el texto claro de la Ley 117 entender, según aducen los demandantes-peticionarios, que el 1.5% correspondiente al impuesto municipal se encuentra comprendido dentro del 5.5% establecido en la Sección 2410. Por mandato expreso de la Sección 2405 (c), los recaudos obtenidos en pago del 5.5% pertenecen, en su totalidad, al Estado Libre Asociado. Por tanto, incluir el 1.5% de la Sección 6189 dentro del 5.5% de la Sección 2410, tendría el efecto de negarles a los municipios el derecho a utilizar los fondos que la propia Ley 117 les reconoce en la Sección 6189 A.

Sabido es que los municipios poseen una personalidad jurídica propia e independiente a la del Estado Libre Asociado de Puerto Rico, por lo cual, bajo ninguna regla de hermenéutica legal aplicable, podemos concluir que el legislador, al destinar los recaudos del 5.5% al Estado Libre Asociado, incluyó a los municipios dentro de dicho mandato. Ello sería darle un significado diferente a las palabras utilizadas por el legislador.

La única interpretación integrada, lógica y razonable, de la Ley 117 de 2006, es la imposición de un impuesto estatal a una tasa contributiva base de 5.5%, a la cual debe sumarse una tasa contributiva, separada e independiente, de 1.5% correspondiente al impuesto municipal, para una tasa contributiva total máxima de 7%.

Dicha interpretación es una correcta en estricto derecho, pues sabido es que las disposiciones de una ley no deben ser interpretadas de manera aislada, sino analizadas en conjunto tomando en consideración integralmente todo su contexto. El texto de la citada Ley 117 es claro, por lo cual decretamos la validez de la intención que surge de éste, sin necesidad de ir más allá de la letra de la ley. Véase: Departamento de Hacienda v. Telefónica Larga Distancia de Puerto Rico, *ante; Rosario Toledo v. Distribuidora Kikuet, Inc.,* 151 D.P.R. 634 (2000).

Incluso, la propia Cámara de Representantes reconoció, indirectamente, la interpretación aquí decretada. Recordaremos que, luego de aprobado el Proyecto Sustitutivo, la Cámara de Representantes, en un intento de reconsiderar y enmendar el texto aprobado por ambos cuerpos legislativos, propuso añadir en el cuerpo de la Ley 117 que el 5.5% comprende una tasa contributiva única y total (4% para el Estado y 1.5% para los Municipios) y eliminar de la Sección 2406 (b) el 1.07 y sustituirlo por 1.055. Ese intento no es más que un acto afirmativo de reconocimiento de que la Ley 117, según aprobada, impone mediante su texto una tasa contributiva total máxima de 7%.

Ahora bien, aun cuando los peticionarios aceptan que la Sección 2406 (b) --referente a la ecuación del 1.07-- hace referencia a la tasa contributiva del 7%, alegan que

la misma proviene del proyecto original y que dicha Sección se mantuvo por error en el Proyecto Sustitutivo aprobado. Aducen en apoyo a su señalamiento que en el Reglamento 7230, mediante el artículo correspondiente a la Sección 2406 (b), el Secretario de Hacienda utiliza como variable el 1.055. Entienden que ello refleja el error en la Sección 2406 (b).

No les asiste la razón. En primer lugar, sabido es que al interpretar el texto de una ley no debemos acudir a las razones intrínsecas que motivaron a que éste se redactara en la forma en que lo fue. Nuestra función se limita al texto claro de la Ley.

De otra parte, de un análisis integrado y armonioso de las disposiciones señaladas, entendemos que la referencia al 7% en la mencionada Sección no corresponde a un mero error u omisión. Ello en vista de que, mientras en la Ley de la Justicia Contributiva el legislador reguló tanto el impuesto estatal como municipal, en el Reglamento 7230 el Secretario de Hacienda se limitó a regular el impuesto estatal, por lo cual resulta razonable que en la Ley la ecuación se hiciese a base de un 7%, pues corresponde a la suma de ambas tasas contributivas reguladas en dicha pieza.

Por el contrario, debido a que las disposiciones del Reglamento 7230 se limitan a regular el impuesto estatal, resulta razonable que en dicho Reglamento el Secretario de Hacienda se limitara a incluir la variable correspondiente

a la tasa contributiva del impuesto estatal, entiéndase, 5.5%. El propio Reglamento exceptúa el impuesto municipal de dicha ecuación y les impone a los comerciantes la responsabilidad de cumplir con el pago de lo impuestos pertenecientes a los municipios.[14]

En fin, del texto de la Ley --el cual resulta ser la máxima expresión de la intención legislativa-- surge claramente que se estableció una tasa contributiva máxima total de 7%, 5.5% correspondiente al impuesto estatal y un 1.5% correspondiente al impuesto municipal.[15]

---

[14] Artículo 2406-1 (b): "... Excepto en el caso de pagos de impuestos relacionados a ventas realizadas en municipios para los cuales el Departamento actúe como cobrador y administrador centralizado, las ventas tributables se determinarán dividiendo las ventas brutas entre 1.055, quedando como responsabilidad del comerciante u operador de la máquina dispensadora el cumplimiento con su obligación, si alguna, de pago a un municipio".

[15] Aunque lo previamente expresado dispone de la presente controversia, resulta pertinente señalar que un estudio de la exposición de motivos de la Ley de la Justicia Contributiva de 2006 confirma la determinación a la que hemos llegado. Mediante la misma el legislador nos remite a los sistemas tributarios de distintas jurisdicciones de los Estados Unidos, especialmente, al sistema tributario de la Florida. A esos efectos, el legislador expresó:

"En el análisis de esta medida se consideraron los sistemas tributarios de varios estados, entre ellos, Hawaii, Nueva York y Florida. Mayormente, nuestro IVU ha seguido el modelo del impuesto sobre ventas y uso de la Florida por las siguientes razones: (i) es ampliamente conocido que por muchos años los puertorriqueños han visitado y vacacionado en el Estado de la Florida, por lo cual han experimentado el IVU fijado por la Florida; (ii) en años recientes, un número considerable de puertorriqueños se han establecido en dicho estado pero mantienen vínculos estrechos con Puerto Rico y viajan frecuentemente a la Isla y pueden compartir su

(Continúa . . .)

IV

En mérito de lo antes expuesto, resolvemos que la Ley

de la Justicia Contributiva de 2006 establece un impuesto

sobre las ventas y el uso a una tasa contributiva total

_____

experiencia con el IVU impuesto en Florida; y (iii) la experiencia positiva de Florida con su sistema de IVU ha permitido que no se le impongan a los individuos contribución sobre sus ingresos, logrando a su vez altos recaudos para el erario público."

La ley contributiva del estado de la Florida, muy similar a la Ley de la Justicia Contributiva de 2006, establece un impuesto sobre las ventas y el uso mediante dos tasas contributivas separadas e independientes, una correspondiente al estado y otra correspondiente a los municipios o "counties"; al igual que en nuestra Ley contributiva, se regulan ambas tasas mediante artículos independientes. Mientras que en su Sección 212.05 establece un impuesto sobre las ventas y el uso a una tasa contributiva base de 6%, en las Secciones 212.054 y 212.055 autoriza a los municipios o "counties" a establecer un impuesto a una tasa contributiva de hasta un 1.5%.

A pesar de estar regulada mediante la misma pieza legislativa, la tasa contributiva municipal es una independiente y separada de la tasa contributiva base de 6% y la misma no se entiende comprendida dentro del 6%. "Florida has a base tax rate of 6%. Local taxes are in addition to this base rate." State of Florida Department of Revenue, History of Local Sales Tax and Current Rates, 2006, http://taxlaw.state.fl.us. Igual estructura e interpretación recibe el estatuto contributivo del Estado de Nueva York. Véanse Artículos 28 y 29 del Tax Law del Estado de Nueva Cork, Secciones 1101-1264.

Al utilizar como modelo los sistemas tributarios antes descritos y, al igual que éstos, establecer un impuesto estatal y municipal mediante artículos independientes, la única interpretación lógica y razonable del texto de la Ley 117 es que nuestro legislador tuvo la intención de establecer un impuesto sobre las ventas y el uso mediante dos tasas contributivas separadas y distintas, y que la tasa correspondiente al impuesto municipal no se encuentra comprendida en el 5.5% establecido en la Sección 2401 de dicha Ley.

máxima de 7%; 5.5% correspondiente al impuesto estatal y un 1.5% correspondiente al impuesto municipal.

Se dictará Sentencia de conformidad.


FRANCISCO REBOLLO LÓPEZ
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Carlos Romero Barceló, Peter
Muller, Hipólito Robles Rivera,
Antonio Pino Marina y otros

    Demandantes-peticionarios

       vs.

Estado Libre Asociado de Puerto
Rico, Hon. Aníbal Acevedo Vilá
en su capacidad de Gobernador,
Hon. Juan Carlos Méndez Torres,
en su capacidad de Secretario

de Hacienda

    Demandados-recurridos

CT-2006-9     CERTIFICACIÓN

SENTENCIA

San Juan, Puerto Rico, a 10 de noviembre de 2006

Por los fundamentos expuestos en la Opinión que antecede, se resuelve que la Ley de la Justicia Contributiva de 2006 establece un impuesto sobre las ventas y el uso a una tasa contributiva total máxima de 7%; 5.5% correspondiente al impuesto estatal y un 1.5% correspondiente al impuesto municipal.

Así lo pronunció, manda el Tribual y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Fuster Berlingeri emitió Opinión de Conformidad. El Juez Asociado señor Rivera Pérez emitió Opinión Disidente. La Juez Asociada señora Rodríguez Rodríguez emitió Opinión Disidente.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Carlos Romero Barceló, Peter
Muller, Hipólito Robles Rivera,
Antonio Pino Marina y Otros

     Demandantes-Peticionarios

          vs.

Estado Libre Asociado de Puerto      CT-2006-9      Certificación
Rico, Hon. Aníbal Acevedo Vilá
en su capacidad de Gobernador,
Hon. Juan Carlos Méndez Torres
en su capacidad de Secretario
de Hacienda

     Demandados-Recurridos

Opinión de Conformidad emitida por el Juez Asociado SEÑOR FUSTER BERLINGERI.

San Juan, Puerto Rico, a 10 de noviembre de 2006.

Estoy conforme con la Opinión emitida por la mayoría del Tribunal en el caso de autos. Comparto plenamente lo que allí se dispone y los fundamentos en que se apoya el dictamen mayoritario. No obstante, deseo hacer hincapié brevemente en dos aspectos del asunto ante nuestra consideración. La controversia que aquí nos concierne **<u>sólo este Tribunal puede resolverla con finalidad</u>** y por su importancia es menester que no quede duda alguna sobre los sólidos fundamentos de lo que hoy dictaminamos.

En primer lugar, debe quedar claro que lo dispuesto en el Art. 14 del Código Civil de Puerto

Rico, no es meramente una norma de nuestro propio sistema legal, sino que es también **un principio general de Derecho**. La norma que establece ese Artículo, de que si el texto de una ley es claro, la letra de ésta no puede ser menospreciada por una supuesta intención legislativa contraria a la letra, ha sido reconocida reiteradamente en la jurisdicción federal, incluso por el propio Tribunal Supremo de Estado Unidos. El más alto foro judicial americano lo ha señalado así:

> "... We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete'".

Barhart v. Sigmon Coal Co., Inc., 534 US 438, 460-62 (2002). Véase, además, Oncale v. Sundowner Offshare Servs., 523 US 75, 79 (1998); Ratzlaf v. U.S., 510 US 135, 147-148 (1994); US v. Missouri Pac R & Co., 278 US 269, 278 (1929); Recording Indus. Ass. of Amer. Inc. v. Verizon Internet Servs. Inc., 351 F 2d 1229, 1237 (D.C. Cir. 2003); Stromberg Metal Works, Inc. v. Press Mechanical, Inc., 77 F 3d 928, 931 (7th Cir. 1996); Eagle Pitcher Industries, Inc. v. U.S. Environmental Protection Agency, 759 F 2d 922, 929 (1985).

Una reconocida autoridad en estos asuntos ha expresado el aludido principio general de Derecho palmariamente:

> "Where the terms of a statute are clear..., the legislative intent must be derived from it, even if the intent expressed conflicts with the

> purpose of the statute as set forth in committee
> reports."

Norman J. Singer, *2A Sutherland Statutory Construction*, §
48.6 (6th ed.)

No puede haber duda, pues, que el propio texto de la
ley, cuando éste es claro, constituye la expresión
definitiva de la intención que finalmente tuvo el
legislador. No puede invocarse otra supuesta intención
legislativa para menoscabar lo que la ley en sí
literalmente dispone de manera clara.

## II

Lo otro que se debe enfatizar es que en cuanto a la
cuestión concreta que nos concierne en el caso de autos, **el
lenguaje de la ley es claro**. Por un lado, se establece un
**impuesto estatal de 5.5%** y por otro se faculta a los
municipios a establecer **un impuesto separado de 1.5%**. No
hay base alguna en el texto del estatuto para una
interpretación distinta sobre estos extremos. De hecho, **el
4% de impuesto estatal invocado por las partes
peticionarias no se menciona en ningún lado de la ley, ni
siquiera indirectamente**. Sencillamente, no hay referencia
alguna a un supuesto impuesto estatal de 4% en la ley en
cuestión.

Es por todo lo anterior que debemos coincidir aquí con
lo expresado por un alto foro judicial federal de manera
pertinente:

> "It is elementary in the law of statutory construction that, absent ambiguity or unreasonable result, the literal language of a statute controls and resort to legislative history is not only unnecessary but improper."

Montgomery Charter Serv. Inc. v. Washington Metropolitan Area Transit Comm'n, 325 F. 2d 230, 233 (D.C. Cir. 1963).

JAIME B. FUSTER BERLINGERI
JUEZ ASOCIADO

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Carlos Romero Barceló y otros

    Demandantes Peticionarios

      v.                       CT-2006-009

E.L.A. y otros

    Demandados Recurridos


Opinión Disidente emitida por el Juez Asociado señor Rivera Pérez.


San Juan, Puerto Rico, a 10 de noviembre de 2006.

La Opinión Mayoritaria interpreta el alcance de la Ley Núm. 117[16], a los efectos de que faculta al gobierno central a cobrar un cinco punto cinco (5.5%) por ciento por concepto del IVU, a la vez que permite que los municipios cobren un uno punto cinco (1.5%) por ciento en virtud del referido impuesto. Respetuosamente disentimos.

I

El 15 de noviembre de 2005, la delegación mayoritaria de la Cámara de Representantes de Puerto Rico, en adelante delegación mayoritaria, compuesta por legisladores electos

---

[16] Ley Núm. 117 de 4 de julio de 2006.

por el Partido Nuevo Progresista, en adelante PNP, radicó el
Proyecto de la Cámara 2193, en adelante el P. de la C. 2193,
para establecer la "Ley de Justicia Contributiva de 2006."[17] El
propósito de la legislación era, entre otros, autorizar el cobro
de un siete (7%) por ciento en las ventas al detal, por concepto
del Impuesto sobre Ventas y Uso, en adelante IVU. El P. de la
C. 2193 fue referido a la Comisión de Hacienda y Asuntos
Financieros de la Cámara de Representantes, en adelante Comisión
de Hacienda, para que ésta realizara los correspondientes
estudios, análisis y recomendaciones previo a su aprobación.
Como parte de sus trabajos legislativos, la Comisión de Hacienda
realizó, entre los meses de febrero a mayo de 2006, alrededor de
treinta y cinco (35) vistas públicas para evaluar los méritos
del P. de la C. 2193.[18]

Luego de efectuadas las referidas vistas, el 20 de junio
de 2006, la delegación mayoritaria del PNP en la Cámara **radicó
un Proyecto Sustitutivo para dejar sin efecto diversas
disposiciones contenidas en el P. de la C. 2193, en**

---

[17] Proyecto de la Cámara de Representantes Núm. 2193, Apéndice del recurso de Certificación, págs. 170-246.

[18] Presentación P. de la C. 2193, Apéndice del recurso de Certificación, págs. 607-610. Depusieron los siguientes: Departamento de Hacienda, Banco Gubernamental de Fomento, Departamento de Desarrollo Económico y Comercio, Colegio de Contadores Públicos Autorizados, Asociación de Bancos de Puerto Rico, Departamento de Asuntos al Consumidor, Asociación de Industriales, Asociación de Economistas de Puerto Rico, Oficina del Comisionado de Instituciones Financieras, Cámara de Comercio de Puerto Rico, Colegio de Abogados de Puerto Rico.

**adelante Proyecto Sustitutivo.**[19] **El Proyecto Sustitutivo dispuso, en lo pertinente, para el cobro de un IVU total de cinco punto cinco (5.5%) por ciento.**

La Comisión de Hacienda radicó, conjuntamente con el Proyecto Sustitutivo, **un extenso Informe Positivo, mediante el cual describía detalladamente el alcance, la intención, así como el propósito del Proyecto Sustitutivo al establecer un impuesto a las ventas al detal.**[20] Por tal razón, a las páginas 40 y 41 del Informe, en lo pertinente, la Comisión de Hacienda puntualizó lo siguiente:

> **D- Aspectos Relevantes Concluyentes sobre Reforma Contributiva**
>
> Como resultado de los análisis efectuados sobre el Proyecto de Reforma Contributiva, en adición a los cambios técnicos del cambio de un sistema de arbitrios a uno de impuestos sobre las ventas al detal (IVD), **presentaremos los puntos relevantes de esta pieza legislativa.** **Sustituye el sistema de arbitrios por un impuesto general sobre venta al detal de 5.5% (4% para el Estado y 1.5% para los municipios)**. (Énfasis suplido).
>
> **E- Sobre el Impuesto a las Ventas**
>
> Luego de atendidos todos los escenarios sobre la determinación de bases del gasto de consumo (Ver tabla A y B Apéndice Económico), **se fija el impuesto de Venta al Detal de la siguiente manera:**
>
> **El impuesto estatal será de 4%**

---

[19] Sustitutivo al P. de la C. 2193, Apéndice del recurso de Certificación, págs. 454-603.

[20] Informe Positivo sobre el Sustitutivo del P. de la C. 2193, Apéndice del recurso de Certificación, 245-454.

(…)

**El impuesto municipal será de 1.5%**

El Informe Positivo de la Comisión de Hacienda, así como el Proyecto Sustitutivo fueron sometidos al pleno de la Cámara de Representantes para votación el 21 de junio de 2006. El Presidente de la Comisión de Hacienda, Honorable Antonio Silva Delgado, mediante el uso de recursos electrónicos y audiovisuales, realizó una extensa presentación del Proyecto Sustitutivo en el hemiciclo de la Cámara de Representantes.[21] **Durante la misma se presentó una proyección a la que se denominó "Recaudo Estimado-Total/Distribución-Estado-Municipios." En ésta se desglosó el recaudo estimado del IVU para el estado y los municipios utilizando como base el cinco punto cinco (5.5%) por ciento, que claramente se subdividió en cuatro (4%) por ciento para el gobierno central y uno punto cinco (1.5%) por ciento para los municipios.**[22]

Durante el debate en el hemiciclo de la Cámara, referente a la aprobación del Proyecto Sustitutivo, varios legisladores de la delegación mayoritaria hicieron referencia **a un IVU total de un cinco punto cinco (5.5%) por ciento, a la vez que rechazaron la cifra de siete (7%) por ciento.**[23]

---

[21] Presentación P. de la C. 2193, Ley de Reforma Contributiva 2006, Apéndice del recurso de Certificación, págs. 604-643.

[22] Íd, a la pág. 614. Véase pág. 11 de la Presentación.

[23] Diario de Sesiones, Sustitutivo al P. de la C. 2193, 21 de junio de 2006, 15ta Asamblea Legislativa, págs. 60, 87,

(Continúa . . .)

Conviene repasar algunas de las expresiones de los miembros de la delegación mayoritaria del PNP durante el debate parlamentario, **para auscultar la intención legislativa de la mayoría parlamentaria, al aprobar el porcentaje del IVU, contenido en el Proyecto Sustitutivo.** Veamos.

El representante de la Mayoría, Honorable Jorge Navarro Suárez, expresó lo siguiente:

> **"Y aquí tenemos un por ciento de un *sales tax* de 5.5%,** lo que ustedes no creían en la campaña electoral, hicieron campaña, jugaron politiquería para echar hacia atrás su posición…" (Énfasis suplido).Pág. 60.

La Honorable Albita Rivera Ramírez, miembro de la delegación mayoritaria, se expresó de la manera siguiente:

> **"Así que, es importante, amigo contribuyente que sepas, que si no te han clavado con un siete por ciento en el *sales tax*,** es por que aquí hay una legislatura del Partido Nuevo Progresista que ha velado porque no se sigan cargando a los contribuyentes…" (Énfasis suplido). Pág. 87.

Más adelante en la discusión parlamentaria del Proyecto Sustitutivo, la Honorable Lourdes Ramos Rivera, legisladora electa por el PNP, se expresó en los términos siguientes: "…buscando como gravar el bolsillo del pueblo contribuyente con un ***sales tax* de un siete por ciento que no se justifica…"** (Énfasis suplido). Pág. 100.

---

100, 101, 110, 111, 117, 125, Apéndice del recurso de Certificación, págs. 644-791.

De igual manera, la referida legisladora, expresó lo siguiente:

> "Estamos hablando…también los compañeros de…ahora sí, ahora el proyecto 2193 como tenía el siete por ciento era el mejor del mundo, pero son ciegos o es que no quieren ver la realidad, había que escribir ahí un número para partir pero desde el principio se habló de que lo que intentábamos era que fuera el menor por ciento posible, **¿y cómo le explico al pueblo que le estoy quitando el 6.6 para ponerle un 7?"** (Énfasis suplido). Pág. 101.

El representante de la Mayoría, Honorable Julio Román González, expresó las palabras siguientes:

> "Lo que ellos, como uno de los compañeros **que nos retó para que se aprobara el 7 por ciento**, y eso es el pedido del Sr. Gobernador, que le dio la notita para que lanzara ese reto a esta delegación. ¿Para qué? Para tener más dinero y seguir abusando del pueblo puertorriqueño con mayores imposiciones, como dijo otro que el siete era menos que el cuatro. Yo no he visto en ninguna matemática que un número mayor sea menor que uno…un número menor. No sé dónde está la matemática, en qué colegio se la enseñaron, **pero un cuatro es un cuatro y un siete es un siete.**" Pág. 110.

> (…)

> "Una reforma que ofrece alrededor de 500 millones de dólares en rebajas contributivas y en beneficios a la clase menesterosa de este país, **y quieren el 7…y que saquen la cuenta de quiénes son los que van a pagar el 7."** (Énfasis suplido). Pág. 110.

El representante de la delegación mayoritaria, Honorable José Concepción Hernández, manifestó lo siguiente:

"Los que no quieren ceder y siguen en el capricho del 7 por ciento del Señor Gobernador son nuestros amigos. Yo personalmente estuve con el compañero Nelson del Valle, Sergio Ortiz y Pedrito, que fui y me reuní con el Gobernador buscando **que bajara el 7 por ciento diciéndole la realidad de Puerto Rico y lo que vimos en la calle**. Porque en la calle la misma iglesia que uno va es la misma iglesia que ustedes van. **El mismo parque de pelota, las ligas infantiles y juveniles de pelota, de baloncesto, dondequiera… en los programas de radio, la gente no quiere el 7 por ciento**." (Énfasis suplido). Pág. 111.

En su turno, el representante de la delegación mayoritaria, Honorable Luis Pérez Ortiz, expresó las palabras siguientes:

"Aquí tiene la reforma señor Gobernador, y no solamente, señor Presidente, y me va a permitir hacerle estas expresiones. No es solamente hacerle llegar la reforma, que aprendan a creer, señor Presidente, en nosotros mismos. ¿Cuál es la prisa? ¿**A qué le tienen ellos temor de no darle ese espacio de seis meses para aprobar el nivel de captación de ese 5.5 por ciento**…" (Énfasis suplido). Pág. 117.

El legislador del PNP, Honorable Ángel Pérez Otero, emitió las palabras siguientes:

"Yo le invito a la delegación del Partido Popular y al pueblo de Puerto Rico, que hagan sus cómputos. No tan solo [sic] en las planillas, **sino también con este impuesto al consumo de 5.5, que**

> **definitivamente, cuando finalicen esos cómputos van a percatarse y a darse cuenta, de lo que se está aprobando por la delegación del Partido Nuevo Progresista es favorable, es beneficioso para el Pueblo de Puerto Rico."** (Énfasis suplido). Pág. 125.

El 21 de junio de 2006, **luego de un extenso debate parlamentario**, el Proyecto Sustitutivo fue aprobado por la Cámara de Representantes con treinta y un (31) votos a favor y diez y ocho (18) en contra.[24]

**Se desprende claramente del récord legislativo, recogido en el Diario de Sesiones de la Cámara de Representantes de 21 de junio de 2006, que los miembros de la delegación mayoritaria del PNP emitieron su voto <u>bajo la creencia y el convencimiento de que estaban aprobando un IVU total de cinco punto cinco (5.5%) por ciento; que se habría de desglosar en un cuatro (4%) por ciento para el gobierno central y uno punto cinco (1.5%) para los municipios</u>.**

Por el contrario, los representantes de la delegación minoritaria del Partido Popular Democrático, en adelante la minoría del PPD, votaron en contra de la medida, **toda vez que la misma disponía para la imposición de un IVU total de cinco punto cinco (5.5%) por ciento, a la vez que rechazaba la imposición de un IVU de siete (7%) por ciento.** El Portavoz de la minoría del PPD, Honorable Héctor Ferrer Ríos, presentó una enmienda al Proyecto Sustitutivo para

---

[24] Apéndice del recurso de Certificación, pág. 718.

subir el IVU de un cinco punto cinco (5.5%) por ciento a un seis punto cinco (6.5%) por ciento.[25]  Se desprende del récord legislativo que **los representantes de la minoría del PPD se oponían al Proyecto Sustitutivo, toda vez que el mismo alteraba completamente el P. de la C. 2193, radicado originalmente el 15 de noviembre de 2005 por la delegación del PNP.**  <u>**Se oponían, en esencia, porque el Proyecto Sustitutivo cambiaba la tasa total del IVU de un siete (7%) por ciento, contemplado en el P. de la C. 2193, a un cinco punto cinco (5.5%) por ciento.**</u>[26]

---

[25] El Portavoz de la minoría del PPD, Honorable Héctor Ferrer Ríos, se expresó de la manera siguiente: "Segunda enmienda, en el Capítulo 2, sección 2401, en el subinciso [sic] (b), sustituir '5.5 por ciento' por '6.5'". Pág. 103.  Asimismo, más tarde en el debate, el Portavoz de la minoría del PPD, sugirió subir la tasa del IVU de un 5.5% a un 6.5%.  Por tal motivo, expresó las palabras siguientes:

> "Señor Presidente, esta enmienda propuesta lo que hace es que atempera prácticamente, y soluciona el déficit presupuestario o estructural que tiene el gobierno de Puerto Rico, en un período básico de algunos tres años.  Si antes de ese término se cobra el dinero suficiente y se paga, automáticamente se elimina ese uno por ciento del impuesto a la venta y se baja al 5.5.  **Hacemos todo lo contrario de lo que ustedes quieren hacer.  Un 5.5 para subir a un 6.5…"** (Énfasis suplido). Pág. 113.

[26] El Honorable Ferdinand Pérez Román, miembro de la minoría del PPD, se expresó de la manera siguiente:

> "Hoy, pues quizás las presiones políticas y los escenarios que se viven en la Cámara de Representantes, pues han provocado unos cambios en las posturas después de tantos meses de trabajo. **Pero la realidad es que desde que**

(Continúa . . .)

Quizás las expresiones más claras e ilustrativas sobre las razones por las cuales la minoría del PPD votó en contra del Proyecto Sustitutivo, surgen de las expresiones vertidas por el Honorable Sergio Ortiz Quiñones, legislador de la minoría del PPD, quien se expresó de la forma siguiente:

> "Y aquí también hay que recordar **que hubo en un momento dado que estaban a favor de un 7 por ciento, y de la noche a la mañana, en un 4 o un 5.5, y siguieron bajando.**" Pág. 73. (Énfasis suplido).

Se desprende también del historial legislativo del Proyecto Sustitutivo que en todo momento la minoría del PPD entendía que el IVU, contenido en el Proyecto

> **se radicó el Proyecto el 15 de noviembre, por la Mayoría del PNP, que tenía como base un 7 por ciento…** eso no lo inventó nadie. No se lo inventó el Partido Popular, fue el Proyecto que ustedes radicaron. Después que se empezó a elaborar y a discutir ese Proyecto, el 2193, el 16 de enero, el Ejecutivo presentó su Proyecto de enmiendas….La verdad es, que después de tantos meses de trabajo analizando los dos Proyectos, cogieron los dos Proyectos, los echaron a la borda **y sacaron un nuevo Proyecto.** Después de meses y meses de ponencias, de semanas de trabajo, de esfuerzo de horas allí, **hoy estamos discutiendo otra cosa totalmente distinta a lo que los deponentes presentaron. Es más, básicamente tendríamos que hacer vistas nuevamente del Proyecto que radican hoy porque no tiene nada de lo que radicaron el 15 de noviembre, que era el 2193. Es un Proyecto totalmente distinto.**" Pág. 57. (Énfasis suplido).

proveía para el cobro de un impuesto total de cinco punto cinco (5.5%) por ciento. Asimismo, los legisladores de la minoría del PPD expresaron su deseo de imponer un IVU de siete (7%) por ciento para alegadamente darle alivios contributivos al pueblo.

El Proyecto Sustitutivo quedó aprobado con el lenguaje siguiente:

### Sección 2401- Impuesto sobre ventas

(a) Se impondrá, cobrará y pagará, a los tipos establecidos en esta sección, un impuesto sobre toda transacción de venta de una partida tributable en Puerto Rico. La aplicación del impuesto estará sujeta a las exenciones concedidas en el Capítulo 3 de este subtítulo.

(b) La tasa contributiva será de un cinco punto cinco **(5.5%)** por ciento del precio de venta de la partida tributable y de transacciones combinadas. (Énfasis suplido).

### Sección 2402- Impuesto sobre Uso

(a) Se impondrá, cobrará y pagará, a los tipos establecidos en esta sección, un impuesto sobre uso almacenaje o consumo de una partida tributable en Puerto Rico.

(b) La tasa contributiva será de un cinco punto cinco **(5.5%)** por ciento del precio de compra de la partida tributable. (Énfasis suplido).

### Sección 2410- Limitación para fijar Impuestos

> Excepto según se dispone en la Sección 6189, ningún municipio, autónomo o no, del Estado Libre Asociado de Puerto Rico, podrá imponer o recaudar arbitrio o impuesto alguno sobre artículos, servicios, partidas tributables, o transacciones que estén sujetos o eximidos del impuesto sobre ventas y uso establecido en este Subtítulo, según establecido en la sección 6188 del Subtítulo F.

> **Sección 6188- Limitación para fijar Impuestos**

> **Excepto según se dispone a continuación o en la Sección 6189**, ningún municipio, autónomo o no, del Estado Libre Asociado de Puerto Rico, podrá imponer o recaudar ninguna contribución o impuesto establecido en este Código.

> **Sección 6189- Imposición Municipal de Impuesto de Ventas y Uso al Detal**

> A. **Se autoriza a los Municipios a imponer un impuesto sobre ventas y uso al detal de conformidad con la autorización establecida en la Sección 2410.** Dicha contribución será por una tasa contributiva de **un uno punto cinco (1.5%) por ciento**, a ser impuesta de conformidad con la misma base, exenciones y limitaciones contenidas en el Subtítulo BB del Código… (Énfasis suplido).

Así las cosas, el 21 de junio de 2006, la Cámara de Representantes envió al Senado de Puerto Rico, en adelante el Senado, el Proyecto Sustitutivo aprobado. El mismo fue referido a la Comisión de Hacienda del Senado, en adelante Comisión del Senado. El Presidente del Senado, Honorable Kenneth McClintock Hernández, en adelante Presidente del Senado, relevó a la Comisión del Senado de los trámites

legislativos referentes al Proyecto Sustitutivo. **Por tal motivo, dicha Comisión no produjo un informe con recomendaciones, debates o análisis en torno al referido proyecto.**

El 25 de junio de 2006, el Presidente del Senado sometió a votación el Proyecto Sustitutivo en dicho cuerpo legislativo. Ese mismo día, esto es, el 25 de junio de 2006, el Senado aprobó, **sin debate, enmiendas y sin informe de la Comisión del Senado,** el Proyecto Sustitutivo con veinte y tres (23) votos a favor y dos (2) en contra.[27] **<u>Los miembros del Senado votaron por el Proyecto Sustitutivo tal como lo había aprobado la Cámara de Representantes</u>**. En vista de que la Comisión del Senado no produjo un informe, ni se llevó a cabo un debate legislativo, **el historial donde se plasmó la intención legislativa, al aprobar el Proyecto Sustitutivo, es el debate vertido en el hemiciclo de la Cámara de Representantes.**

El 27 de junio de 2006, el Gobernador de Puerto Rico, Honorable Aníbal Acevedo Vilá, en adelante el Gobernador, manifestó que interpretaba el Proyecto Sustitutivo como uno que establecía un IVU de cinco punto cinco (5.5%) por ciento para el gobierno central, a la vez que proveía para el cobro de un impuesto municipal de un uno punto cinco (1.5%) por ciento. Asimismo, el Gobernador expresó que coincidía con la interpretación hecha por el Senado, a los

---

[27] Demanda presentada por los peticionarios ante el Tribunal de Primera Instancia el 30 de octubre de 2006, Apéndice del recurso de Certificación, pág. 9.

efectos de que el Proyecto Sustitutivo aprobado proveía para el cobro de un IVU de siete (7%) por ciento, desglosado en un cinco punto cinco (5.5%) para el gobierno central y uno punto cinco (1.5%) por ciento a nivel municipal.[28]

El 28 de junio de 2006, previo a que el Proyecto Sustitutivo se convirtiera en ley con la firma del Gobernador, la Cámara de Representantes aprobó dos (2) Resoluciones **reafirmando su intención legislativa al aprobar el Proyecto Sustitutivo. Reiteraron que el IVU aprobado proveía para el cobro de un cinco punto cinco (5.5%) por ciento total, desglosado en un cuatro (4%) por ciento para el gobierno central y un uno punto cinco (1.5%) para los municipios.**[29]

El 4 de julio de 2006, el Gobernador firmó el Proyecto Sustitutivo, convirtiéndose el mismo en la Ley Núm. 117 de 4 de julio de 2006.

El 13 de octubre de 2006, el Secretario de Hacienda, Honorable Juan Carlos Méndez, en adelante el Secretario, promulgó el Reglamento administrativo, en adelante el

---

[28] *"Fortaleza coincide con interpretación en el Senado"* Periódico Primera Hora, 27 de junio de 2006, pág. 9, Apéndice del recurso de Certificación, pág. 959; *"Reforma Firmada"* Periódico El Vocero, miércoles 5 de julio de 2006, pág. 6, Apéndice del recurso de Certificación, pág. 1130.

[29] R. de la C. 5269 y R. Conc. de la C. 81, Apéndice del recurso de Certificación, págs. 960-963.

Reglamento, que autoriza al gobierno central a cobrar un cinco punto cinco (5.5%) por ciento por concepto del IVU.[30]

Ante tal actuación, el 30 de octubre de 2006, los peticionarios presentaron una demanda en el Tribunal de Primera Instancia, Sala Superior de San Juan, contra el Gobernador y el Secretario. Alegaron que éstos hicieron una interpretación errónea y tergiversada del Proyecto Sustitutivo, que luego se convirtió en la Ley Núm. 117, *supra*, mediante la cual pretenden imponer el cobro de un cinco punto cinco (5.5%) por ciento, por concepto del IVU a nivel estatal. Alegan, entre otras cosas, que el Proyecto Sustitutivo, así como **el récord legislativo del debate de aquel proyecto, dejó claramente establecido que se aprobaba un IVU a nivel estatal de cuatro (4%) por ciento y el uno punto cinco (1.5%) por ciento a nivel municipal.**[31] Ese mismo día presentaron ante este Tribunal un Recurso de Certificación para que atendamos la controversia trabada ante el foro primario.

Mediante Resolución de 31 de octubre de 2006, le concedimos a las partes un término de siete (7) días para que se expresen sobre los méritos de la acción presentada originalmente ante el Tribunal de Primera Instancia. Asimismo, ordenamos a que se expresaran sobre la

---

[30] Reglamento del Departamento de Hacienda para implantar las disposiciones del Subtítulo BB-Impuesto sobre Ventas y Uso-, Apéndice del recurso de Certificación, págs. 38-170.

[31] Demanda presentada por los peticionarios ante el Tribunal de Primera Instancia el 30 de octubre de 2006.

legitimación activa de los peticionarios para instar el recurso de epígrafe.

El Procurador General compareció en representación del Gobernador y el Secretario. Alegó, entre otras cosas, que la Ley Núm. 117, *supra*, no adolece de ambigüedad. Indicó que el texto de la referida ley es claro y que, ante esta situación, no se debe acudir a la intención legislativa, de conformidad con las reglas de hermenéutica, para interpretar el alcance del estatuto. Reseñó que la referida ley establece expresamente el cobro de una tasa porcentual de cinco punto cinco (5.5%) por ciento para el gobierno central, **separada y distinta**, del uno punto cinco (1.5%) por ciento, por concepto del IVU municipal. Puntualizó que la Ley Núm. 117, *supra*, no debe ser interpretada a la luz del debate en el hemiciclo de la Cámara de Representantes ya que las expresiones de "algunos legisladores" no pueden sustituir el texto de la ley, aprobada sin enmiendas por la Cámara y el Senado, y firmada por el Gobernador.

Alegó, además, que las secciones 2401 y 2402, *supra*, contenidas en la Ley Núm. 117, *supra*, disponen para el cobro de un IVU de cinco punto cinco (5.5%) por ciento a ser cobrado por el Estado Libre Asociado. **Señaló que la tasa porcentual de las referidas secciones no incluyen la tasa porcentual de uno punto cinco (1.5%) por ciento municipal**, provista por las secciones 6188 y 6189, *supra*, de la referida ley. Indicó que los argumentos presentados por los peticionaros no logran crear dudas en torno a la

letra de la ley ya que el texto de la misma constituye la expresión por excelencia de la intención legislativa.

Argumenta, además, que la intención legislativa de un solo cuerpo legislativo no puede atribuírsele al otro, o al Gobernador, toda vez que el Senado aprobó la Ley Núm. 117, *supra*, conforme al texto de la misma, mientras que el Gobernador firmó la referida ley exclusivamente a partir del texto contenido en el estatuto.  Indicó que ni los Senadores, ni el Gobernador tuvieron ante sí las expresiones del debate legislativo, efectuado en la Cámara de Representantes, referente a la aprobación de la Ley Núm. 117, *supra*.  Por otro lado, esgrimió que el Proyecto Sustitutivo, *supra*, no cambió radicalmente el P. de la C. 2193, sino **que meramente separó, con mayor claridad, las tasas porcentuales del IVU entre el gobierno central y los municipios**.  Finalmente, señaló que interpretar la referida legislación a los efectos de que impone un IVU total de cinco punto cinco (5.5%) por ciento traería consecuencias nefastas para la economía del país, toda vez que las proyecciones económicas gubernamentales se han efectuado a base de un IVU total de siete (7%) por ciento.[32]

Por su parte, los peticionarios de epígrafe alegaron que el Reglamento aprobado por el Secretario es nulo, toda vez que provee para el cobro de un IVU de cinco punto cinco (5.5%) por ciento a nivel  estatal, **desvirtuando el mandato**

---

[32] Alegato de las Partes Recurridas, págs. 11-45.

**legislativo, que provee para el cobro de un cuatro (4%) por ciento.**

Alegaron, en síntesis, que el texto de la Ley Núm. 117, *supra*, provoca confusión y dudas sobre su alcance y aplicación. Intimaron que la interpretación de una ley en forma **contraria a la intención del legislador** constituye una usurpación de las prerrogativas de la rama legislativa. Arguyeron que la referida ley no faculta a los municipios a cobrar un IVU **separado y distinto** al cinco punto cinco (5.5%) por ciento del gobierno central. Indicaron que durante todo el trámite legislativo, esto es, durante las vistas públicas realizadas por la Comisión de Hacienda, el Informe Positivo preparado por ésta, el debate en el hemiciclo de la Cámara de Representantes, se discutió la aprobación de un IVU total de cinco punto cinco (5.5%) por ciento. Sostuvieron que, ante este escenario, **se debe acudir a la intención legislativa para auscultar la voluntad del legislador al aprobar una ley**. Puntualizaron que del debate realizado en la Cámara de Representantes se desprende la intención indubitada de la delegación mayoritaria de aprobar un IVU total de cinco punto cinco (5.5%) por ciento.

Por otra parte, señalaron que, en casos de dudas, los estatutos que imponen contribuciones deben interpretarse de manera restrictiva en contra del gobierno y a favor del contribuyente. Precisaron que, cuando el propósito de imponer una contribución no es claro, la duda se resuelve a favor de la no imposición de la misma. Arguyeron, además,

que después de un extenso estudio del P. de la C. 2193, *supra*, que proveía para el cobro de un IVU total de siete (7%) por ciento, la Comisión de Hacienda precisó la necesidad de incluir innumerables enmiendas al mismo. En consecuencia, indicaron, se presentó el Proyecto Sustitutivo, *supra*, **cambiando la tasa autorizada del IVU de un siete por ciento (7%) a un cinco punto cinco (5.5%) por ciento total**. Finalmente, esbozaron que, debido a que el Senado aprobó el Proyecto Sustitutivo, *supra*, sin debate legislativo, informes o enmiendas, el mismo quedó aprobado tal como lo había aprobado la Cámara, esto es con un IVU total de cinco punto cinco (5.5%) por ciento.[33]

La Cámara de Representantes presentó su posición en torno al porcentaje aprobado por concepto del IVU, contenido en la Ley Núm. 117, *supra*.[34] En su alegato, indicaron, entre otras cosas, que el Proyecto Sustitutivo, *supra*, **disponía para el cobro de un IVU total de cinco punto cinco (5.5%) por ciento**. Asimismo, precisaron que el texto de la Ley Núm. 117, *supra*, es susceptible de diversas interpretaciones. No obstante, arguyeron que **en ausencia de un lenguaje claro en el texto de la ley, se debe recurrir a la intención legislativa y al historial del Proyecto Sustitutivo para conocer el verdadero propósito**

---

[33] "Escrito Exponiendo la Posición de los Peticionarios", págs. 18-34, presentada ante nos el 7 de noviembre de 2006.

[34] El 1 de noviembre de 2006, la Cámara de Representantes presentó una "Solicitud de Intervención y/o Comparecencia como *Amicus Curiae*." El 2 de noviembre de 2006, le concedimos a la Cámara y al Senado un término de siete (7) días para que expresaran su posición por escrito.

**del legislador**. Reiteraron que cuando surgen dudas sobre el alcance de una ley que impone contribuciones, la interpretación debe favorecer al ciudadano. Intimaron que el Gobernador y el Secretario se extralimitaron en sus facultades al interpretar, acomodaticiamente, el alcance del Proyecto Sustitutivo, *supra*. Puntualizaron que, toda vez que el Senado aprobó el referido Proyecto sin debates, informes o enmiendas, la intención legislativa de la Cámara de Representantes quedó inalterada. Alegaron, además, que con sus actuaciones, el Gobernador y el Secretario han usurpado las prerrogativas de la Rama Legislativa. Solicitan que se declare nulo el Reglamento promulgado por el Secretario, en virtud del cual se faculta al gobierno central al cobro de un cinco punto cinco (5.5%) por ciento, por concepto del IVU. Sostienen que el Proyecto Sustitutivo, *supra*, que luego se convirtió en la Ley Núm. 117, *supra*, provee, **conforme a la intención legislativa, para el cobro de un cuatro (4%) por ciento de IVU para el gobierno central.**[35] Finalmente, expresaron que, de conformidad con la Constitución de Puerto Rico, es la Cámara de Representantes el cuerpo legislativo donde se originan las medidas para obtener rentas e imponer contribuciones.[36] En consecuencia, intimaron, la intención legislativa de ese cuerpo es **determinante al momento de interpretar estatutos que imponen contribuciones**.

---

[35] Íd.

[36] 1 L.P.R.A., Documentos Históricos.

Por otro lado, el 6 de noviembre de 2006, el Banco Gubernamental de Fomento, en adelante BGF, presentó una "Solicitud de Autorización para comparecer como *Amicus Curiae*." El BGF presentó una diversidad de argumentos por los cuales entendía se debía interpretar la Ley Núm. 117, *supra*, a los efectos de que autoriza el cobro de un IVU total de siete (7%) por ciento. Fundamentó sus alegaciones en el hecho de que las proyecciones económicas, presentadas por el Gobierno a distintos inversionistas, así como a las agencias acreditadoras calificadoras del crédito del Gobierno de Puerto Rico, se basan en la entrada en vigor de un IVU total de siete (7%) por ciento. Intima que, de interpretarse que la referida legislación provee para el cobro de un IVU total de cinco punto cinco (5.5%) por ciento, se lastimaría severamente la economía del país. Arguye que tal determinación podría tener repercusiones nefastas en las finanzas del país, así como en la emisión de deuda pública, mediante bonos, del Gobierno de Puerto Rico. [37]

**A la luz del Proyecto Sustitutivo, el Informe Positivo de la Comisión de Hacienda de la Cámara de Representantes, la presentación audiovisual que hiciera el Presidente de la Comisión de Hacienda, Honorable Antonio Silva Delgado, a todos los legisladores, las expresiones de éstos durante el debate del Proyecto Sustitutivo, así como la votación final aprobando la pieza legislativa, concluimos que el lenguaje**

---

[37] Memorando de Comparecencia Especial del Banco Gubernamental de Fomento para Puerto Rico, págs. 1-25.

**aprobado en el estatuto, disponiendo para el cobro de un IVU total de siete (7%) por ciento, constituye un error de redacción en el texto de la ley.**

II

Coincidimos con lo expresado por la Mayoría en cuanto a la legitimación activa de los peticionarios, así como con las expresiones referentes a la madurez del recurso ante nuestra consideración.

*A.     Aplicación de las Reglas de Hermenéutica en la interpretación de estatutos.*

Dentro de nuestra forma republicana de gobierno tenemos el deber de interpretar las leyes y despejar las lagunas que puedan existir en las mismas, **utilizando como guía la intención del legislador.**[38]

Por tales motivos hemos manifestado que es norma firme de hermenéutica que la letra clara de una ley es la mejor expresión de su espíritu.[39]

El artículo 14 del Código Civil de Puerto Rico dispone lo siguiente: "cuando la ley es clara y libre de toda ambigüedad, la letra de ella no debe ser menospreciada bajo el pretexto de cumplir su espíritu."[40] Del lenguaje de este estatuto se **colige que la ley está sujeta a ser interpretada**, limitando tal interpretación,  en algunos

---

[38] Alejandro Rivera v. E.L.A., 140 D.P.R. 538, 545 (1996).

[39] Santiago v. Supte. Policía de P.R., 151 D.P.R. 511 (2000); Alejandro Rivera v. E.L.A., *supra*; Meléndez v. Tribunal Superior, 90 D.P.R. 656 (1964).

[40] 31 L.P.R.A. sec. 14.

casos, a lo que surja del texto claro de la misma.  No obstante, el artículo 19 del Código Civil de Puerto Rico, reconoce que **el espíritu de la ley, reflejado en la intención legislativa, es la mejor herramienta para encontrar el verdadero sentido de una ley.**[41]  **El espíritu de la ley juega un papel fundamental en la interpretación de un estatuto.  La intención del legislador al aprobar una ley es tan importante que hemos establecido que si la letra de una ley está en contraposición de su espíritu, claramente establecido en el historial legislativo, prevalecerá el espíritu de la ley.**[42]

Hemos resuelto que la función de los tribunales es interpretar la ley y no juzgar la sabiduría del legislador al aprobarla.[43]  **Al interpretar un estatuto, la intención legislativa debe ser buscada en el lenguaje usado en él, con la ayuda que permiten las reglas de hermenéutica legal.**  Al descargar nuestra función de interpretar una disposición particular de un estatuto **debemos siempre considerar cuáles fueron los propósitos perseguidos por la Asamblea Legislativa al aprobarlo**, de manera que nuestra interpretación asegure la efectividad de la intención que

---

[41] Íd, sec. 19.

[42] Sucn. Alvarez v. Srio. de Justicia, 150 D.P.R. 252 (2000); Pueblo v. Zayas Rodríguez, 147 D.P.R. 530 (1999); Figueroa v. Díaz, 75 D.P.R. 163 (1953).

[43] Alonso García v. S.L.G., 155 D.P.R. 91 (2001); Famanina v. Corp. Azucarera de P.R., 113 D.P.R. 654 (1982).

**lo anima.**[44] Hemos expresado anteriormente que **la literalidad de una ley puede ser ignorada por los tribunales cuando ella es claramente contraria a la verdadera intención o propósito legislativo.**[45] El tribunal debe rechazar una interpretación literal y forzada de un texto legal **que conduzca a un resultado que no puede haber sido el que intentó el legislador.** **La letra de la ley no puede ser seguida ciegamente en casos que no caen dentro de su espíritu.**[46]

Los tribunales debemos siempre considerar cuáles fueron los propósitos perseguidos por la Asamblea Legislativa al aprobar una legislación, de manera que **su interpretación asegure la efectividad de la intención legislativa.**[47]

Por tal razón, si los tribunales interpretan la ley en forma contraria **a la evidente intención del legislador, se estarían usurpando las prerrogativas de la rama legislativa.**[48]

### B. Prerrogativas de la Rama Legislativa.

---

[44] Irizarry v. J & J Cons. Prods., Co., Inc., 150 D.P.R. 155 (2000); Dorante v. Wrangler of P.R., 145 D.P.R. 408 (1998); Vázquez v. A.R.P.E., 128 D.P.R. 513 (1991).

[45] Pueblo v. Zayas Rodríguez, *supra*; Otero de Ramos v. Srio. de Hacienda, 156 D.P.R. 876 (2002).

[46] Íd.

[47] J.P. v. Frente Unido I, 2005 T.S.P.R. 17, 2005 J.T.S. 122, 155 D.P.R.____ (2005).

[48] Íd.; Alejandro Rivera v. E.L.A., *supra*.

En la esfera administrativa, la ley es la fuente legal o el medio que le confiere el poder a una agencia administrativa para velar por el cumplimiento de su ley habilitadora.[49] La ley habilitadora es el mecanismo legal que autoriza y delega a la agencia administrativa los poderes para que actúe **conforme al propósito perseguido en dicha ley**.[50] En nuestra función revisora de reglamentos administrativos no podemos perder de perspectiva que **un reglamento promulgado para implementar la ejecución de una ley puede complementarla, pero no estar en conflicto con ésta.**[51] **Si el reglamento está en conflicto con la ley habilitadora que permite y promueve su creación, la disposición reglamentaria tiene que ceder ante el mandato legislativo.**[52] Por tal motivo, hemos manifestado que un reglamento es nulo si claramente está en conflicto o en contra de la ley.[53] Bajo la doctrina de delegación de poderes, **el organismo administrativo goza de las funciones que se le han encomendado legislativamente.**[54] En ausencia de un mandato legislativo expreso o implícito, **aquella**

---

[49] J.P. v. Frente Unido I, *supra*; Caribe Comms., Inc. v. P.R.T.Co., 157 D.P.R. 203 (2002).

[50] Íd.

[51] Íd.; Pérez v. Com. Rel. Trab. Ser. Pub., 158 D.P.R. 180 (2002); Asoc. Fcias. Com. V. Depto. De Salud, 156 D.P.R. 105 (2002); P.S.P. v. Comisión Estatal de Elecciones, 110 D.P.R. 400, 409 (1980).

[52] J.P. v. Frente Unido I, *supra*.

[53] Íd; P.S.P. v. Comisión Estatal de Elecciones, *supra.*

[54] Caribe Comms., Inc. v. P.R.T.Co., *supra.*

**actuación administrativa que no obedezca el poder conferido es una actuación *ultra vires* de la agencia administrativa.**[55] Una agencia administrativa no puede asumir jurisdicción sobre situación alguna que no esté autorizada por ley; es decir, **ni la necesidad, ni la utilidad, ni la conveniencia,** pueden sustituir al estatuto en cuanto a fuente de poder de una agencia administrativa. Es por ello que **cualquier duda en cuanto a la existencia de dicho poder debe resolverse en contra del ejercicio del mismo.**[56]

**Cuando el texto de una ley es inconsistente y está en conflicto con la clara y manifiesta intención legislativa, plasmada en un extenso historial legislativo, prevalecerá tal intención.** El debate vertido en el hemiciclo de la Cámara de Representantes, durante la aprobación del Proyecto Sustitutivo, **dejó establecida la clara y manifiesta intención legislativa de aprobar un IVU total de cinco punto cinco (5.5%) por ciento.**

Los miembros de la delegación mayoritaria rechazaron en todo momento la aplicación de un IVU total de siete (7%) por ciento. De igual manera, el Informe radicado conjuntamente con el Proyecto Sustitutivo, así como la presentación realizada por el Presidente de la Comisión de Hacienda, Honorable Antonio Silva Delgado, **establecieron claramente que se estaba considerando un IVU total de cinco**

---

[55] Acevedo v. Mun. de Aguadilla, 153 D.P.R. 788 (2001); Misión Ind. P.R. v. J.P., 146 D.P.R. 64 (1998).

[56] Raimundi Meléndez v. Productora de Agregados, 2004 T.S.P.R. 106, 2004 J.T.S. 106, 162 D.P.R. ____ (2004).

**punto cinco (5.5%) por ciento, desglosado en un cuatro (4%) por ciento para el gobierno central y un uno punto cinco (1.5%) por ciento para los municipios.** Por otra parte, se desprende del récord legislativo que la minoría del PPD intentó, sin éxito, subir el IVU total de un cinco punto cinco (5.5%) por ciento a un seis punto cinco (6.5%) por ciento. Asimismo, las expresiones de los legisladores de minoría dejaron claramente establecido que el Proyecto Sustitutivo había alterado, en su totalidad, el P. de la C. 2193, radicado en noviembre de 2005, que proveía para el cobro de un IVU total de siete (7%) por ciento. Finalmente, la delegación minoritaria reconoció que el Proyecto Sustitutivo bajaba el IVU total de un siete (7%) por ciento a un cinco punto cinco (5.5%) por ciento.[57]

En vista de lo anterior, resulta forzosa la **conclusión que el texto de la ley, según quedó redactado, en cuanto dispone sobre un IVU total de siete (7%) por ciento, es un error de redacción.**[58]

El Reglamento promulgado por el Secretario de Hacienda dispone para el cobro de un IVU a nivel estatal de un cinco punto cinco (5.5%) por ciento. Tal Reglamento es contrario a derecho. **La Asamblea Legislativa aprobó el cobro de un**

---

[57] Véanse las págs. 5-12 de esta Opinión.

[58] En <u>Pueblo v. Alvarez Rodríguez</u>, 154 D.P.R. 566 (2001), expresamos lo siguiente: "Solamente haremos interpretaciones que divergen del texto claro de la ley, como la que hicimos en <u>Pueblo v. Zayas Rodríguez</u>, *supra*, en los casos extraordinarios en los cuales **resulte forzoso concluir del historial legislativo que la Legislatura ha cometido un error accidental de redacción**." (Énfasis suplido).

**IVU total de cinco punto cinco (5.5%) por ciento, donde
solamente se faculta al gobierno central al cobro de un
cuatro (4%) por ciento**.

Legitimar el Reglamento aprobado por el Secretario
lesionaría los principios más fundamentales de nuestro
sistema republicano de gobierno. Validar tal actuación no
sólo infringe las prerrogativas de la Legislatura, sino que
violenta la separación de poderes de nuestro ordenamiento
constitucional.

**Concluimos que el Reglamento aprobado por el Secretario
es nulo por ser contrario al poder que le delegó la Asamblea
Legislativa, en virtud de la Ley Núm. 117,** *supra*.

*C. Interpretación de estatutos contributivos.*

Recientemente tuvimos la oportunidad de atender una
controversia que versaba, en esencia, **sobre la interpretación
de estatutos contributivos.**[59] En aquella ocasión expresamos
lo siguiente:

> "En la interpretación de estatutos
> que imponen contribuciones, es la
> práctica establecida no extender
> sus disposiciones, por implicación,
> más allá del claro alcance del
> lenguaje usado, o ampliar su radio
> de manera que comprenda materias
> que no han sido específicamente
> señaladas. **En caso de duda, se
> interpretan estrictamente en contra**

---

[59] BBC Realty v. Secretario Hacienda, 2005 T.S.P.R. 186, 2005
J.T.S. 191, 166 D.P.R.____ (2005).

**del Gobierno y a favor del ciudadano."**[60] (Énfasis suplido).

De igual manera, determinamos que es un principio cardinal que **la legislación contributiva no se interpreta en forma extensiva**, sino que debe interpretarse en forma justa y a tenor con sus propios y expresos términos.[61] En BBC Realty v. Secretario Hacienda, *supra*, concluimos, guiados por las reglas de hermenéutica, que cuando **una ley que impone contribuciones, impuestos, o arbitrios no advierta sobre la intención del legislador, <u>la misma se debe interpretar restrictivamente en contra del Estado y a favor del ciudadano</u>**. Puntualizamos que la interpretación restrictiva de estatutos contributivos **se limita únicamente a aquellas instancias en las que el Estado pretende imponerle al ciudadano el cobro de una contribución, impuesto o arbitrio**.[62] Reafirmamos que los estatutos que imponen contribuciones deben interpretarse de una forma justa, para así cumplir con sus propios y expresos términos. Obrar de otra manera violentaría principios básicos, de raíces firmes en nuestra jurisprudencia y en nuestro ordenamiento jurídico. **Cuando el propósito de**

---

[60] El Más Alto Foro Federal determinó que, ante la duda sobre la procedencia de una contribución, la misma debe resolverse a favor del ciudadano; Gould v. Gould, 245 U.S. 151 (1917).

[61] BBC Realty v. Secretario Hacienda, *supra*; Talcott Inter-Amer Corp. v. Registrador, 104 D.P.R. 254 (1975).

[62] Central Coloso v. Descartes, Tes., 74 D.P.R. 481, 486 (1953); Plácido Longo & Cía. v. Sancho, 50 D.P.R. 160 (1936).

imponer una contribución <u>no es claro</u>, la duda debe resolverse a favor de la no imposición de la misma.[63]

**Concluimos que el texto de la Ley Núm. 117, *supra*, es inconsistente y está en conflicto con la clara y manifiesta intención legislativa de aprobar un IVU total de cinco punto cinco (5.5%) por ciento**. Ante tal situación, no podemos avalar que se interprete tal legislación en perjuicio del ciudadano y a favor del Gobierno. El cobro de un IVU de cinco punto cinco (5.5%) por ciento para el gobierno central, sumado al uno punto cinco (1.5%) por ciento a nivel municipal, para un total de siete (7%) por ciento, **es claramente más perjudicial para el ciudadano que el cobro de un IVU total de cinco punto cinco (5.5%) por ciento**.

A tenor con el mandato legislativo, resulta procedente el cobro de un IVU total de cinco punto cinco (5.5%) por ciento, del cual cuatro (4%) por ciento corresponde al gobierno central y uno punto cinco (1.5%) por ciento a los municipios.

III

La decisión de la Mayoría desvirtúa la clara y manifiesta intención legislativa de la Cámara de Representantes que, a su vez, es el cuerpo obligado por el Artículo 3, sección 17 de la Constitución de Puerto Rico, *supra*, a originar medidas de recaudo. Ignora el historial legislativo que existe en torno a la Ley Núm. 117, *supra*, toda vez que el Senado aprobó dicha legislación sin

---

[63] <u>BBC Realty v. Secretario Hacienda</u>, *supra*.

debates, enmiendas o informes de Comisión, o sea, tal como quedó aprobada por la Cámara de Representantes. Le imprime un peso desproporcionado al texto de la ley que hace referencia a un IVU total de siete (7%) por ciento **cuando del récord legislativo surge claramente que tal porcentaje es un error de redacción**. No podemos avalar tal curso de acción.

El profundo respeto que nos merece la intención del legislador nos obliga en determinadas ocasiones a suplir las inadvertencias en que éste pueda haber incurrido. Para evitar un resultado irrazonable e insostenible, en el pasado no hemos vacilado en aclarar el texto de una ley conforme a la intención legislativa. Es regla dorada de hermenéutica judicial, que las disposiciones de una ley deben ser examinadas e interpretadas de modo que no conduzcan a resultados irrazonables e insostenibles, sino a unos armoniosos.[64]

IV

Por los fundamentos antes expuestos, disiento del criterio de la Mayoría.

Efraín E. Rivera Pérez
Juez Asociado

---

[64] Pueblo v. Zayas Rodríguez, *supra*.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Carlos Romero Barceló,
y otros

    Demandantes-Peticionarios

        v.

CT-2006-9

Estado Libre Asociado,
y otros

    Demandados-Recurridos


Opinión disidente emitida por la Juez Asociada señora Rodríguez Rodríguez


San Juan, Puerto Rico, a 10 de noviembre de 2006

**Este caso no es justiciable.** Hoy, una mayoría de los miembros de este Tribunal sostiene que los demandantes, como contribuyentes y ciudadanos, tienen legitimación activa para impugnar en los tribunales la interpretación que hace la Rama Ejecutiva de una ley de contribuciones de aplicación general y uniforme aprobada por la Asamblea Legislativa, sin que éstos hayan alegado que haya habido violación constitucional de clase alguna. Disiento porque soy del criterio que la conclusión del Tribunal respecto la legitimación de los demandantes es errónea y no encuentra apoyo en la doctrina sobre el pleito del contribuyente.

Sostengo que ante la naturaleza generalizada de la queja presentada por los demandantes, sumado a la ausencia de un planteamiento de violación de un derecho constitucional por la puesta en vigor de la Ley de Justicia Contributiva, éstos carecen de legitimación activa como contribuyentes y pensionados, o ciudadanos, para impugnar la interpretación de la ley por parte de la Rama Ejecutiva. Ello a su vez nos lleva a concluir que el curso de acción correcto es la desestimación de la demanda instada.

Los hechos en este caso están sustancialmente resumidos en la Opinión del Tribunal, por lo que no entendemos necesario reiterar los mismos. Pasemos entonces a la discusión propiamente de la controversia que hoy pende ante nosotros.

**I**

**A**

El caso ante nosotros plantea un asunto de interpretación estatutaria de la Ley de Justicia Contributiva, Ley Núm. 117 de 4 de julio de 2006 (la "Ley de Justicia Contributiva"); no se cuestiona por lo tanto, la constitucionalidad de la Ley de Justicia Contributiva o la actuación de funcionarios de la Rama Ejecutiva.

Mediante una solicitud de sentencia declaratoria, los demandantes Carlos Romero Barceló, Peter Muller Maldonado, y un grupo de ocho (8) ciudadanos pensionados acuden ante nosotros en su capacidad de contribuyentes los primeros, y de contribuyentes y pensionados los segundos. Invocan la

jurisdicción de este Tribunal con el propósito de impugnar **la interpretación que tanto el Departamento de Hacienda, como el Gobernador del Estado Libre Asociado le han dado a la tasa contributiva sobre ventas y uso aprobada por la Asamblea Legislativa en la Ley de Justicia Contributiva**, y que debe comenzar a regir en el país a partir del 15 de noviembre de 2006. Específicamente, los peticionarios arguyen que **"ante la ausencia de una redacción expresa en el texto de la [Ley de Justicia Contributiva]"** el Gobernador está impedido de "aplicar una tasa contributiva de siete por ciento (7%) de IVU." Alegato de los peticionarios, pág. 18. (Énfasis en original.)

**B**

La sentencia declaratoria es un mecanismo procesal de carácter remedial o profiláctico, que le permite a un ciudadano dilucidar ante los tribunales los méritos de cualquier reclamación que entrañe un peligro potencial en su contra. *Charana v. Pueblo*, 109 D.P.R. 641, 653 (1980). Al solicitar una sentencia declaratoria, el ciudadano puede obtener protección judicial antes de que el peligro haya madurado hasta convertirse en una grave calamidad y antes que la otra parte inicie un litigio para hacer efectivas sus reclamaciones.

Este mecanismo propicia la seguridad y certidumbre en las relaciones jurídicas tanto en el ámbito público, como en el privado. *Véase Moscoso v. Rivera*, 67 D.P.R. 481, 488 (1954); *Sánchez v. Srio. Justicia*, 157 D.P.R. 360 (2002).

El mismo debe utilizarse cuando permita dar por concluido un estado de incertidumbre o inseguridad en cuanto a derechos reclamados. *Suárez Jiménez v. Comisión Estatal de Elecciones*, res. 20 de noviembre de 2004, 163 D.P.R.\_\_, 2004 TSPR 179.

Las Reglas de Procedimiento Civil establecen que "[e]l Tribunal de Primera Instancia tendrá autoridad para declarar derechos y otras relaciones jurídicas aunque se inste o pueda instarse otro remedio." Regla 59.1 de las Reglas de Procedimiento Civil, 32 L.P.R.A. Ap. III. Quedan así facultados los tribunales para interpretar estatutos que afectan los derechos de un ciudadano y declarar cuáles son los "derechos, estados u otras relaciones jurídicas que de aquéllos [estatutos] se deriv[a]n." Regla 59.2 de Procedimiento Civil, 32 L.P.R.A. Ap III.[65]

Surge de este marco doctrinal que la sentencia declaratoria es el medio adecuado para ejercer nuestra función como últimos interpretes de las leyes y la Constitución, declarando el estado de derecho vigente bajo

---

[65] Dicha regla establece:

Toda persona interesada en una escritura, testamento, contrato escrito, u otros documentos constitutivos de contrato, o cuyos derechos, estado u otras relaciones jurídicas fuesen afectados por un estatuto, ordenanza municipal, contrato o franquicia, podrá solicitar una decisión sobre cualquier divergencia en la interpretación o validez de dichos estatutos, ordenanzas, contrato o franquicia, y además que se dicte una declaración de los derechos, estados u otras relaciones jurídicas que de aquéllos se deriven. Un contrato podrá ser interpretado antes o después de haber sido infringido. 32 L.P.A. Ap III, R. 59.2.

el palio de nuestros estatutos. Sin embargo, la sentencia declaratoria no le permite a un promovente prescindir de los requisitos de justiciabilidad que nuestro ordenamiento establece para instar un pleito coercitivo plenario. En tal sentido, un demandante tiene que demostrar, entre otras cosas, que tiene legitimación activa para instar el litigio que se encuentre pendiente ante un tribunal. *Sánchez v. Srio. Justicia, supra,* pág. 384; *Moscoso v. Rivera, supra.*

Como cuestión de umbral entonces, debemos determinar si en el presente caso estamos ante una controversia justiciable que amerite nuestra intervención.

**C**

**i**

El principio de justiciabilidad es tal vez la limitación más importante al ejercicio del poder judicial. Determina qué asuntos pueden ser atendidos por los tribunales y cuáles deben ser desestimados. En *Com. de la Mujer v. Srio. de Justicia*, 109 D.P.R. 715, 720 (1980) definimos este concepto de la siguiente manera:

> Es el término artístico empleado para expresar una doble limitación impuesta sobre los tribunales, a saber: (1) que sólo pueden decidir 'cuestiones presentadas en un contexto adversativo y en una forma históricamente visualizada como capaz de ser resultas a través del proceso judicial' y (2) la restricción surge del papel asignado a la judicatura en una distribución tripartita de poderes, diseñada para asegurar que no intervendrá en áreas sometidas al criterio de otras ramas del gobierno. Flast v. Cohen, 392 U.S. 83 (1968). La doctrina es autoimpuesta. En virtud de ella los propios tribunales se preguntan y evalúan si es o no apropiado entender en determinado caso tomando en cuenta diversos factores y circunstancias

mediante una análisis que les permite ejercer su discreción en cuanto al límite de su poder constitucional.

El concepto de justiciabilidad se concreta en las doctrinas de legitimación activa, academicidad, cuestión política, madurez y en la proscripción a los tribunales de emitir opiniones consultivas. Véase, *E.L.A. v. Aguayo,* 89 D.P.R. 552, 558-59 (1958); *Hernández Torres v. Hernández Colón*, 131 D.P.R. 593, 598-99 (1992); *Noriega v. Hernández Colón*, 135 D.P.R.406, 422 (1994); *Sánchez v. Srio. de Justicia*, 157 D.P.R. 360 (2002).

Somos del criterio que la adjudicación en los méritos de los reclamos de los demandantes-peticionarios, como veremos, constituye una clara violación a las normas que hemos pautado respecto legitimación activa, principalmente en lo que se refiere al pleito del contribuyente.

## ii

La doctrina de legitimación activa busca asegurar que el promovente de una acción posea un interés en el pleito "de tal índole que, con toda probabilidad, habrá de proseguir su causa de acción vigorosamente y habrá de traer a la atención del tribunal las cuestiones en controversia". *Noriega v. Hernández Colón, supra*, pág. 427; *Hernández Agosto v. Romero Barceló,* 112 D.P.R. 407, 413 (1982). Para asegurarnos que es así, hemos exigido que el demandante pueda demostrar que: (1) ha sufrido un daño claro y palpable; (2) el daño es real, inmediato y preciso, no abstracto o hipotético; (3) existe una relación causal

entre la acción que se ejecuta y el daño alegado; y (4) la causa de acción surge al amparo de la Constitución o de alguna ley. *Hernández Torres v. Hernández Colón, supra*, pág. 599.[66]

Son varios los valores o principios que subyacen la doctrina de acción legitimada y los mismos han matizado nuestras decisiones en el pasado. Destaca entre estos el reconocimiento que la exigencia de acción legitimada promueve el respeto institucional a la separación de poderes, atemperando el rol del tribunal en una sociedad democrática. En ese sentido, busca evitar que la Rama Judicial se inmiscuya a destiempo en controversias fundamentalmente políticas cuya solución final le compete a las ramas políticas del gobierno. Véase, *Raines v. Byrd*, 521 U.S. 811, 819 (1997)("standing inquiry is especially rigorous [because of separation of powers concerns] when reaching the merits of a dispute would force [it] to decide whether an action taken by one of the other two branches of the federal government was unconstitutional.") Véase además, Scalia, The Doctrine of Standing as an Essential Element of the Separation of Powers, 17 *Suffolk L. Rev*. 881 (1983).

---

[66] La Asamblea Legislativa, sin embargo, puede conferirle a determinadas personas legitimación activa para a presentar un recurso judicial determinado al amparo de un estatuto. Este no es el caso ante nuestra consideración. En ausencia de un estatuto que le conceda legitimación activa, el demandante tiene que cumplir con los requisitos que hemos enumerado.

Ello no obstante, no hay duda que habremos de asumir nuestra función constitucional cuando lo exijan las circunstancias para en efecto preservar ese delicado balance entre las ramas del gobierno, decretando la ilegalidad o inconstitucionalidad de una actuación legislativa o ejecutiva. En última instancia de lo que se trata es de determinar cuál es el rol apropiado en nuestra sociedad para los tribunales. Con claridad, el profesor Chemerinsky señala: "Separation of powers can be undermined either by overexpansion of the role of the federal courts or by undue restriction. Standing thus focuses attention directly on the question of what is the proper place of the judiciary in the American system of government." E. Chemerinsky, *Constitutional Law, Principle and Policies*, Aspen Publishers, New York, 2002, pág. 61.

Si bien hemos expresado que la doctrina sobre capacidad jurídica para entablar demanda contra las agencias y funcionarios gubernamentales debe ser interpretada amplia y liberalmente, *Solís v. Municipio de Caguas*, 120 D.P.R. 53, 56 (1987), ello no implica que hemos abandonado el requisito de que todo litigante tiene que demostrar que ha sufrido un daño concreto y palpable para que los tribunales consideren su reclamo en los méritos.

Precisamente, el requisito de daño claro y palpable responde a la prohibición de que los litigantes presenten quejas generalizadas que se pueden dilucidar de forma más efectiva en las ramas representativas del gobierno. *Véase,*

*Warth v. Seldin*, 422 U.S. 490, 499 (1975).("[W]hen the asserted harm is a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens, that harm alone normally does not warrant exercise of jurisdiction.") Por lo tanto, el mero hecho de que una acción gubernamental lesione o afecte los intereses de los ciudadanos, sin más, no implica que éstos posean legitimación activa para acudir a un tribunal. A modo de ejemplo, el interés abstracto del ciudadano de que el gobierno actúe conforme a la ley es insuficiente para conferirle jurisdicción a un tribunal de justicia sobre cierta controversia. *Allen v. Wright*, 468 U.S. 737, 754 (1984)("This Court has repeatedly held that an asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court.") *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 483 (1982)("[A]ssertion of a right to a particular kind of Government conduct, which the Government has violated by acting differently cannot alone satisfy the requirements of Art. III without draining those requirements of meaning."). Véase además, *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 575 (1992).

Sobre la prohibición de dilucidar controversias en las que los demandantes sólo presentan una queja generalizada, establecimos en *Fundación Arquelógica v. Depto. de la Vivienda*, 109 D.P.R. 387, 392 (1980), que "[l]a capacidad

para demandar no puede depender de un interés … que tienen en común todos los que integran el público, por la naturaleza necesariamente abstracta del agravio que todos los ciudadanos comparten." Véase, *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208 (1974). ("Concrete injury, whether actual or threatened, is that indispensable element of a dispute which serves in part to cast it in a form traditionally capable of judicial resolution.")

En este caso, como vimos, los demandantes invocan la jurisdicción de este Tribunal en calidad de contribuyentes. Veamos entonces esta alegación detenidamente.

## II

### A

"La doctrina que limita la legitimación activa de los contribuyentes es un ejemplo de la política en contra de que se presenten quejas generalizadas en los tribunales de justicia." (Traducción suplida). L. H. Tribe, *American Constitutional Law,* 3era. Ed. Foundation Press, 2000, vol. I, § 3-17, pág. 421.[67] El Tribunal Supremo de los Estados Unidos articuló sus objeciones contra pleitos instados por los contribuyentes en el caso seminal de *Frothingham v.*

---

[67] Sobre este tema confróntese, entre otros: Standt, Taxpayer in Court: A Systematic Study of a (Misunderstood) Standing Doctrine, 52 *Emory L.J.* 771 (2003); Parsons, Comment, Taxpayer's Suits: Standing Barriers and Pecuniary Restraints, 59 *Temple L.Q.* 951 (1986); Schnurer, "More than an Institution, Less than a Theory": Toward a Coherent Doctrine of Standing, 86 *Colum L. Rev.* 564 (1986); Bagen, Standing up for Flast: Taxpayer and Citizen Standing to Raise Constitutional Issues, 67 *Ky. L. Rev.* 147 (1978).

*Mellon*, 262 U.S. 447 (1923).  En *Frothingham* se resolvió que el demandante, quien reclamaba como contribuyente y solicitaba la paralización de unos desembolsos de fondos públicos autorizados mediante legislación federal, no tenía legitimación activa porque su interés en los dineros del tesoro era minúsculo e indeterminado.  262 U.S. pág. 487 ("interest in the moneys of the treasury . . . is comparatively minute and indeterminable.")  El Tribunal dispuso que el demandante tenía que demostrar un daño directo y concreto.  *Id.*, pág. 488 ("[plaintiff must allege direct injury] not merely that he suffers in some indefinite way in common with people generally.")

En *Flast v. Cohen,* 392 U.S. 83 (1968), el Tribunal Supremo se enfrentó nuevamente a un pleito donde se invocaba legitimación activa como contribuyente.  Allí resolvió que la determinación de si un contribuyente está legitimado para instar su pleito dependerá de si existe un nexo lógico entre su estatus como contribuyente y la reclamación que se dilucida.  Para determinar la existencia de dicho nexo diseñó un análisis dual, indicó el Tribunal:

> The nexus demanded of federal taxpayers has two aspects to it.  First, the taxpayer must establish a logical link between that status and the type of legislative enactment attacked.  Thus a taxpayer will be a proper party to allege the unconstitutionality only of exercises of congressional power under the taxing and spending clause of Art. I, s 8, of the Constitution.  It will not be sufficient to allege an incidental expenditure of tax funds in the administration of an essentially regulatory statue. . . . Secondly, the taxpayer must establish a nexus between the status and the precise nature of the constitutional infringement alleged.  Under this

requirement, the taxpayer must show that the challenged enactment exceeds specific constitutional limitations imposed upon the exercise of the congressional taxing and spending power and not simply that the enactment is generally beyond the powers delegated to Congress by Art. I, s 8.

*Flast, supra*, pág. 103.

Con posterioridad a *Flast*, el Tribunal Supremo ha rehusado ampliar lo allí dispuesto. *E.g.*, *United States v. Richardson*, 418 U.S. 166 (1974); *Schlesinger v. Reservists Committee to Stop the War*, *supra*; *Valley Forge Christian College v. Americans United for Separation of Church and State*, *supra.* De ahí que el profesor Chemerinsky, op. cit., pág. 93, resuma la doctrina de pleito del contribuyente de la siguiente forma: "After *Richardson*, *Schlesinger*, and *Valley Forge* the only situation in which taxpayer standing appear permissible is if the plaintiff challenges a government expenditure as violating the establishment clause."

**B**

En nuestro ordenamiento, la Ley Núm. 2 del 25 de febrero de 1946, 32 L.P.R.A secs. 3074-3076 ("Ley Núm. 2"), prohíbe los pleitos en que los demandantes invocan la jurisdicción del tribunal en su calidad de contribuyentes.

La acción del contribuyente, es un tipo de acción que proliferó en Puerto Rico durante la década de los años 1940 cuando el gobierno comenzó a implantar un plan abarcador de desarrollo económico y de reformas sociales. Sobre este particular el profesor Serrano Geyls nos indica lo

siguiente: "Ciertas personas, entre ellas líderes políticos de la oposición, acudieron a los tribunales en su calidad de contribuyentes, a solicitar órdenes para paralizar varios de los nuevos programas del gobierno[, a]leg[ndo] la inconstitucionalidad del gasto." R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, Universidad Interamericana, San Juan, 1997, vol. I, pág. 135. *E.g., Buscaglia v. Corte*, 64 D.P.R. 11 (1944)(donde se confirma una decisión del tribunal inferior que le reconoce al demandante acción legitimada como contribuyente y se paralizan los desembolsos de fondos de varios programas sociales). Véase también, *Suárez Martínez v. Tugwell*, 67 D.P.R. 180 (1946).

A raíz de estos pleitos, la Asamblea Legislativa aprobó la Ley Núm. 2 de 1946. De la exposición de motivos de la Ley Núm. 2, se desprende que su propósito fue evitar litigios en los que se cuestionara "la legalidad o la constitucionalidad de leyes y actuaciones de funcionarios públicos autorizados por ley, **por personas que no han sufrido daño real alguno como resultado de las mismas, y que alegan el derecho a demandar meramente por el hecho de ser contribuyentes**." (Énfasis nuestro.) Exposición de Motivos, Ley Núm. 2 de 25 de febrero de 1946. 1946 L.P.R. 7. Resulta meridianamente claro de lo anterior, que el legislador al prohibir la acción de contribuyentes, **quiso disuadir la proliferación de pleitos en los que el demandante no sufre un daño real e individualizado.** A

estos efectos, en *Suárez v. Tugwell*, 67 D.P.R. 180, 186 (1947), determinamos que la Ley Núm. 2 privó a los tribunales de Puerto Rico de jurisdicción para atender casos en los que se alega tener un derecho que pertenece al público y no a ningún individuo en particular.

Por otro lado, en *Hernández Torres v. Gobernador,* 129 D.P.R. 824 (1992) sostuvimos que un grupo de legisladores en su calidad de contribuyentes y en representación de todos los contribuyentes de Puerto Rico, carecían de legitimación activa para impugnar la constitucionalidad de la Resolución Conjunta que proveía las asignaciones para los gastos ordinarios del Gobierno del Estado Libre Asociado.[68] En *Hernández Torres,* los demandantes habían solicitado un injunction permanente para impedir el uso de fondos asignados al amparo de la Resolución Conjunta bajo el fundamento que el presupuesto aprobado era deficitario. En dicha ocasión resolvimos que los legisladores no tenían legitimación activa porque no demostraron que habían sufrido daños personales, claros y palpables, ni que se le habían menoscabado sus prerrogativas legislativas. *Id.,* pág. 849. Resolvimos también que no tenían legitimación a tenor con lo dispuesto en la Ley Núm. 2.

No es irrazonable concluir que en una situación en que se impugne un gasto autorizado por la Asamblea Legislativa porque se alegue que viola nuestra cláusula de separación

---

[68] Los allí demandantes también reclamaron legitimación a nombre del interés público y como representantes de su electorado.

de iglesia y estado, concluyamos que dicho demandante tiene legitimación activa como contribuyente para instar dicho pleito, independientemente del texto de la Ley Núm. 2. *Asoc. Maestros v. Srio. de Educación*, 137 D.P.R. 528 (1994).

A la luz de lo anterior, parece evidente que en nuestro ordenamiento para reclamar válidamente como contribuyente se requiere que el demandante impugne la validez de una ley o actuación gubernamental mediante la cual se **desembolsan fondos públicos**[69] para un fin específico delineado por el legislador, y que dichos desembolsos violen alguna disposición constitucional. Antes bien, si lo que se reclama es exclusivamente el interés abstracto de que el gobierno cumpla con la ley, somos del criterio que ese contribuyente no tiene legitimación activa. Ello así pues este es un interés generalizado que todos los contribuyentes y ciudadanos comparten de idéntica manera por lo que se dificulta, sino imposibilita, su individualización.

De igual forma, una alegación general en el sentido que la tasa contributiva que habrá de imponer el Rama Ejecutiva afecta el poder adquisitivo del ciudadano y

---

[69] A modo de ejemplo, en *Suárez v. Tugwell*, 67 D.P.R. 180 (1947), determinamos que la Ley Núm. 2 impedía la presentación de una acción de contribuyente en la que el demandante impugnó la asignación de fondos públicos a la Compañía Agrícola de Puerto Rico. El demandante alegó que la asignación ilegal de fondos a dicha compañía le ocasionaría graves e irreparables daños a él como contribuyente y a todos los contribuyentes de Puerto Rico.

contribuyente, pues limita el dinero que se tiene disponible para utilizar, no confiere legitimación activa. Esta es una alegación igualmente generalizada, compartida por toda la ciudadanía y es también indiferenciada. Véase, Opinión Mayoritaria, nota 10. La política pública establecida en la Ley Núm. 2 de 1946, claramente prohíbe pleitos en los que el contribuyente no logra probar la existencia de un interés concreto e individualizado. Véase, *Federal Election Commission v. Akins*, 524 U.S. 11, 35 (1998)(Scalia, J., op. disidente.)

Debemos en este momento referirnos someramente a los fundamentos invocados por la Opinión Mayoritaria para concluir que los demandantes están legitimados para instar este pleito, los cuales no tan sólo no comparto sino que estimo errados.

La Mayoría busca apoyo para su tesis en dos citas, una del profesor Serrano Geyls y la segunda del profesor Tribe. Además, cita en apoyo el caso de *Bacchus Imports v. Dias*, 468 U.S 263 (1984), el cual nos indica sostiene que "un contribuyente tienen legitimación activa para impugnar una ley contributiva que determina su propia responsabilidad como contribuyente." (Énfasis en original.) Opinión del Tribunal, pág. 13.

Ciertamente, a poco que se revise detenidamente la cita al profesor Serrano nos parece evidente que allí no se sostiene la proposición expuesta por la mayoría. Serrano Geyls postula que un contribuyente tiene legitimación

activa para "obtener un reembolso" por lo pagado o por lo que se pretende pagar a la luz de una ley que se estima ilegal o inconstitucional. Ese claramente no es el caso de autos. La segunda situación en la cual se alega que procede el pleito del contribuyente es cuando éste "impugna un acto del gobierno **como inconstitucional** y alega, como razón para probar su interés de litigante, que el contribuye, mediante el pago de impuestos, **al sostenimiento económico del acto alegadamente inconstitucional.**" Nuevamente, esta no es la situación que tenemos ante nuestra consideración. Me pregunto, ¿cuál es el acto alegadamente inconstitucional en este pleito?

La referencia a Tribe, es igualmente errada. Tribe cita en apoyo a la posición expresada en la cita acogida por la Mayoría, los casos de *Bacchus Imports, supra*, y *Regan v. Taxation with Representantion of Washington*, 461 U.S. 540 (1983). Tribe, *op. cit.*, pag. 421 n. 33. **Ninguno de estos dos casos versa sobre la legitimación activa del contribuyente**. El asunto planteado en *Bacchus* era si el arbitrio que imponía Hawaii sobre las ventas de licor al por mayor que eximía de dicho pago licores producidos localmente, violaba la cláusula de comercio por su carácter proteccionista, la cláusula de igual protección de las leyes al discriminar contra productos importados y la cláusula constitucional de importación y exportación. En *Regan*, el Tribunal Supremo sostuvo que una disposición del

Código de Rentas Internas federal relacionada con las corporaciones exentas del pago de contribuciones, que condiciona dicho estatus a que éstas no se involucraran en campañas de cabildeo a los congresistas, era constitucionalmente válida, frente una alegación de que violaba la Primera Enmienda.

A base de lo anterior soy del criterio que los fundamentos invocados por la Opinión del Tribunal son desacertados y no sostienen la posición adoptada por la Mayoría del Tribunal.

**III**

Los demandantes Carlos Romero Barceló, Peter Muller Maldonado, y un grupo de ocho (8) ciudadanos pensionados alegan tener legitimación activa en el presente caso como contribuyentes los primeros, y contribuyentes y pensionados los segundos. En síntesis, acuden ante nosotros para hacer valer el interés generalizado que tiene todo ciudadano en que el Poder Ejecutivo cumpla con la ley según la interpretan, así como también por estimar que la interpretación de la Rama Ejecutiva de la Ley de Justicia Contributiva limita su poder adquisitivo.

Según los demandantes lo que les causa daño es la interpretación que hace el Gobernador de la tasa de interés sobre el consumo y el uso dispuesto en la Ley de Justicia Contributiva, pues eventualmente pagarán más y verán sus finanzas afectadas al "disminuirse" su poder adquisitivo. Su interés es entonces que la ley se interprete conforme

ellos entienden que fue aprobada. Es decir, que el Gobierno aplique la ley correctamente. A todas luces, esto es un reclamo y daño generalizado que comparte toda la ciudadanía. Como hemos dicho, en ausencia de una alegación válida de violación a un derecho constitucional, el reclamo general de que la ley está siendo interpretada equivocadamente es insuficiente para reconocerle a un contribuyente o ciudadano legitimación activa para incoar un pleito como el de autos. Por otro lado, huelga señalar lo obvio, los demandantes no han impugnado desembolso de gasto alguno de parte de la Rama Ejecutiva.

Reconocer que los demandantes poseen legitimación activa para cuestionar la actuación de la Rama Ejecutiva de interpretar el texto de una ley y ponerla en vigor, sin alegación alguna de que ha habido una violación constitucional, abriría las puertas del tribunal de "par en par para la consideración de cualquier caso que desee incoar cualquier ciudadano en alegada protección de una política pública." *Salas Soler v. Srio. de Agricultura*, 102, D.P.R. 716, 723-34 (1974). Más grave aun tal vez, una propuesta de esta naturaleza parecería apuntar a un sistema de gobierno en el que los tribunales cargan con la obligación de "cumplir y hacer cumplir las leyes", facultad ínsita al Poder Ejecutivo. Constitución de Puerto Rico, Art. IV, sec. 4. Véase, *Federal Election Commission, supra*, pág. 36.

Finalmente, tanto los demandantes como la Opinión del Tribunal expresan una preocupación porque de no reconocerles legitimación activa en este caso nadie la tendría.  No compartimos la misma.  Lo cierto es que hay unos asuntos cuya solución no compete a la Rama Judicial y sí al proceso político.  A quienes no les satisfaga la interpretación del Gobernador respecto la Ley de Justicia Contributiva tienen a su haber el poder mas poderoso en una democracia, el voto, para dejarse escuchar.  Ante un planteamiento idéntico al que ahora preocupa a la Mayoría, hago mía las expresiones del Juez Presidente Burger en *Richardson*, 418 U.S. pág. 179, citamos extensamente:

> It can be argued that if respondent is not permitted to litigate this issue, no one can do so.  In a very real sense , the absence of any particular individual or class to litigate these claims gives support to the argument that the subject matter is committed to the surveillance of Congress, and ultimately to the political process. **Any other conclusion would mean that the Founding Fathers intended to set up something in the nature of an Athenian democracy or a New England town meeting to oversee the conduct of the National Government by means of lawsuits in federal courts.** The Constitution created a representative Government with the representatives directly responsible to their constituents . . . that the Constitution does not afford a judicial remedy does not, of course, completely disable the citizen who is not satisfied with the 'ground rules' established . . . Lack of standing within the narrow confines of Art. III jurisdiction does not impair the right to assert his views in the political forum or at the polls.  Slow, cumbersome, and unresponsive though the traditional electoral process may be thought at times, our system provides for changing members of the political branches when dissatisfied citizens convince a sufficient number of their fellow electors that elected representatives are delinquent in performing duties committed to them. (Énfasis nuestro.)

Véase también, *Schlesinger, supra*, pág. 227. ("Our system of government leaves many crucial decisions to the political process. **The assumption that if respondents have no standing to sue, no one would have standing, is not a reason to find standing**.") (Énfasis nuestro.)

Ante la ausencia de una controversia justiciable, soy del criterio que el pleito de epígrafe debió ser desestimado. Por los fundamentos expresados disiento de la Opinión dictada en el día de hoy.


                                        Anabelle Rodríguez Rodríguez
                                              Juez Asociada